# EXHIBIT A



# Delaware

PAGE 1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "NAWA USA, INC." IS DULY
INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN
GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE
RECORDS OF THIS OFFICE SHOW, AS OF THE EIGHTH DAY OF NOVEMBER,
A.D. 2007.



3095829  8300

071199454

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 6143339

DATE: 11-08-07



*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:21 PM 11/07/2007*
*FILED 01:39 PM 11/07/2007*
*SRV 071199454 - 3095829 FILE*

# STATE OF DELAWARE
## CERTIFICATE FOR RENEWAL
## AND REVIVAL OF CHARTER

The corporation organized under the laws of Delaware, the charter of which was voided for non-payment of taxes, now desires to procure a restoration, renewal and revival of its charter, and hereby certifies as follows:

1.     The name of this corporation is __NAWA USA, INC.__

2.     Its registered office in the State of Delaware is located at ___Corporation___ ___Trust Center, 1209 Orange___ (street), City of ___Wilmington___ Zip Code ___19801___ County of ___New Castle___ the name of its registered agent is ___The Corporation Trust Company___

3.     The date of filing of the original Certificate of Incorporation in Delaware was __09/14/1999__

4.     The date when restoration, renewal, and revival of the charter of this company is to commence is the __28__ day of __February 2005__, same being prior to the date of the expiration of the charter. This renewal and revival of the charter of this corporation is to be perpetual.

5.     This corporation was duly organized and carried on the business authorized by its charter until the __1__ day of __March__ A.D. __2005__, at which time its charter became inoperative and void for non-payment of taxes and this certificate for renewal and revival is filed by authority of the duly elected directors of the corporation in accordance with the laws of the State of Delaware.

     **IN TESTIMONY WHEREOF,** and in compliance with the provisions of Section 312 of the General Corporation Law of the State of Delaware, as amended, providing for the renewal, extension and restoration of charters the last and acting authorized officer hereunto set his/her hand to this certificate this __31__ day of __October__ A.D. __2007__.

By: _____
             Authorized Officer

Name: __THOMAS RIESINGER__
             Print or Type

Title: __CEO, PRESIDENT__

# EXHIBIT B

# GOVERNMENT OF THE DISTRICT OF COLUMBIA

## DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS



# C E R T I F I C A T E

**THIS IS TO CERTIFY**  that the attached is a true and correct copy of the documents
for this entity as shown by the records of this office.

*NAWA USA, INC.*

**IN TESTIMONY WHEREOF**  I have hereunto set my hand and caused the seal of this
office to be affixed this **20th** day of **November , 2007** .

LINDA K. ARGO
Director

PATRICIA E. GRAYS
Superintendent of Corporations
Corporations Division

Adrian M. Fenty
Mayor

## GOVERNMENT OF THE DISTRICT OF COLUMBIA

### DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS



# CERTIFICATE

**THIS IS TO CERTIFY** that all applicable provisions of the District of Columbia Business Corporation Act have been complied with and accordingly, this ***CERTIFICATE OF AUTHORITY*** is hereby issued to:

**NAWA USA, INC.**

**IN WITNESS WHEREOF I** have hereunto set my hand and caused the seal of this office to be affixed as of the **20th** day of **November, 2007**.

LINDA K. ARGO
Director

Business and Professional Licensing Administration

PATRICIA E. GRAYS
Superintendent of Corporations
Corporations Division

Adrian M.
Fenty Mayor

# DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
## BUSINESS AND PROFESSIONAL LICENSING ADMINISTRATION
### CORPORATIONS DIVISION

Government
Of the District of Columbia
DCRA
Corporations Division
P.O. Box 92300
WASHINGTON, D.C. 20090



## APPLICATION FOR CERTIFICATE OF AUTHORITY
## FOREIGN BUSINESS OR PROFESSIONAL CORPORATION

**To:**
**Department of Consumer and Regulatory Affairs**
**Business and Professional Licensing Administration**
**Corporations Division**

Pursuant to the provisions of the Code of Laws for the District of Columbia and the BUSINESS CORPORATION ACT and PROFESSIONAL CORPORATION ACT (D.C. Code, 2001 edition, Title 29, Chapter 1 and 4), the undersigned corporation hereby applies for a Certificate of Authority to transact business in the District of Columbia, and for that purpose submits the following statement:

**1. Name of Corporation:**
_NAWA U.S.A Inc._

**2. Name elected to use in the District of Columbia:**
_NAWA USA Inc._
*Review instruction sheet prior to completing this item.*

**3. Incorporated under the laws of the State of:**
_Deleware_

**4. Date of Incorporation:**
_9/14/1999_

**5. Term of Existence:**
_Perpetual_
*Indicate Perpetual or Specify Dissolution Date*

**6. Date commenced or will commence transacting business in the District:**
_6/1/2003_          _2/20/2002_
*Review instruction sheet prior to completing this item.*

**7. Address (including street and number) of its principal office or registered office address in the State/Country where incorporated:**
_CT 1209 Orange Steet W.l. Del 19801_  _SW_

**8. ADDRESS (including street and number) of its MANDATORY registered office and NAME of its registered agent in the District of Columbia:**
Name: _Corporate Creations Network Inc._
Address: _Suite 300 Wash DC. 20006_
*Review instruction sheet prior to completing this item.*

9. Briefly describe the business company proposes to transact in the District:

_Pharmaceutical sales and technology licensing._

*Review instruction sheet prior to completing this item.*

10. All officers, directors and shareholders of the corporation are licensed to practice the profession for which the corporation is incorporated. In the case of a single person corporation, the Secretary of the corporation need not be so licensed.

*For professional corporations only, indicate below whether this statement is applicable or not to your company*

Applicable ____;    Not Applicable √

11. Attach a list of the names and addresses (including street and number) of all officers and directors of the corporation.

NAWA USA, INC.
Corporate Name

Signature of President or Vice President

Signature of Secretary or Assistant Secretary

Corporate Seal

# DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
## BUSINESS AND PROFESSIONAL LICENSING ADMINISTRATION
## CORPORATIONS DIVISION

Government
Of the District of Columbia
DCRA
Corporations Division
P.O. Box 92300
WASHINGTON, D.C. 20090



## APPLICATION FOR CERTIFICATE OF AUTHORITY
### FOREIGN BUSINESS OR PROFESSIONAL CORPORATION

To:
Department of Consumer and Regulatory Affairs
Business and Professional Licensing Administration
Corporations Division

Pursuant to the provisions of the Code of Laws for the District of Columbia and the BUSINESS CORPORATION ACT and PROFESSIONAL CORPORATION ACT (D.C. Code, 2001 edition, Title 29, Chapter 1 and 4), the undersigned corporation hereby applies for a Certificate of Authority to transact business in the District of Columbia, and for that purpose submits the following statement:

**1. Name of Corporation:**
_NAWA U.S.A Inc._

**2. Name elected to use in the District of Columbia:**
_NAWA USA Inc._
*Review instruction sheet prior to completing this item.*

**3. Incorporated under the laws of the State of:**
_Deleware_

**4. Date of Incorporation:**
_9/14/1999_

**5. Term of Existence:**
_Perpetual_
*Indicate Perpetual or Specify Dissolution Date*

**6. Date commenced or will commence transacting business in the District:**
_6/1/2003        2/26/2002_   SW
*Review instruction sheet prior to completing this item.*

**7. Address (including street and number) of its principal office or registered office address in the State/Country where incorporated:**
_CT 1209 Orange Steet W.E. Del 19801_   SW

**8. ADDRESS (including street and number) of its MANDATORY registered office and NAME of its registered agent in the District of Columbia:**
Name: _Corporate Creations Network Inc._
Address: _Suite 300 Wash DC. 20006_
*Review instruction sheet prior to completing this item.*



*Written consent has to be filled by the registered agent*

**DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS**
**BUSINESS AND PROFESSIONAL LICENSING ADMINISTRATION**
**CORPORATIONS DIVISION**

DCRA
Corporations Division
P.O. Box 92300
WASHINGTON, D.C. 20090

**WRITTEN CONSENT TO ACT AS REGISTERED AGENT**

**TO:**
The Superintendent of Corporations
Department of Consumer and Regulatory Affairs
Business and Professional Licensing Administration

**(A) BY A DISTRICT OF COLUMBIA RESIDENT**
PURSUANT TO D.C. CODE TITLE 29, and TITLE 41

I, *Corporate Creations Network Inc.*

A Bona fide Resident of the District of Columbia Herein Consent to Act as a Registered

Agent For: *NAWA USA Inc*

(Name of Business)

SIGNATURE OF REGISTERED AGENT
*Below*

DATE: *10/31/2007*

**(B) BY A LEGALLY AUTHORIZED CORPORATION**
THE CORPORATION HEREIN NAMED IS, *Corporate Creations Network Inc / Corporate Creations International*

An Authorized Corporate Registered Agent in the District of Columbia, per Signatures of
its President/Vice-President and Secretary/Assistant Secretary, Herein Consents to Act as
Registered Agent

For: *NAWA USA INC.*

(Name of Company)

SIGNATURE: _____   **Jim Perkins, Vice President**
OF PRESIDENT OR VICE PRESIDENT

ATTEST: _____   OF SECRETARY OR ASSISTANT SECRETARY

DATE: *10/31/2007*

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS



# C E R T I F I C A T E

**THIS IS TO CERTIFY** that the attached is a true and correct copy of the documents for this entity as shown by the records of this office.

***NAWA USA, INC.***

**IN TESTIMONY WHEREOF** I have hereunto set my hand and caused the seal of this office to be affixed this **20th** day of **November, 2007** .

LINDA K. ARGO
Director

PATRICIA E. GRAYS
Superintendent of Corporations
Corporations Division

Adrian M. Fenty
Mayor

04

BRA-25 (10/96)

★ ★ ★
GOVERNMENT
OF THE
DISTRICT OF COLUMBIA

File Number _____

**TWO-YEAR REPORT FOR FOREIGN AND DOMESTIC BUSINESS CORPORATIONS**

### DUE APRIL 15th

Filing Fee $ 250

Penalty        **PAID**

Interest

Total     $ 325

RETAIN A COPY FOR YOUR RECORDS
SEE REVERSE SIDE FOR FILING FEES, PENALTIES, ETC.
MAKE CHECK PAYABLE TO D.C. TREASURER
MAIL REPORT TO : DEPT. OF CONSUMER AND REGULATORY AFFAIRS
BUSINESS REGULATION ADMINISTRATION, CORPORATIONS DIVISION
P.O. BOX 92300, WASHINGTON, D.C. 20090

Indicate if corporation is

☐ Domestic Profit

☐ Foreign Profit

1. Name of Corporation

   *NAWA USA Inc*

2. Organized under the laws of (insert
   District of Columbia, State or Country)

   *Deleware*

3. If a foreign corporation, the address of its principal office in the state or
   Country where organized

   *1875 I Steet NW.
   Wash D.C. 20006*

4. Name of registered agent and address of registered office in the District of
   Columbia (Do not make change of agent or address on this form)

   *Corporate creations Network Inc
   1629 K Steet NW Wash DC 20006*

5. Brief statement of business or affairs conducted in the District of Columbia

   *Sale of Pharmaceuticals
   and Technology Licensing*

6. If a domestic profit corporation, the address including street and number,
   of principal office in the District of Columbia

   *1875 I Street NW
   Wash D.C. 20006*

7. Name and address, including street and number of directors and officers

| | NAME | ADDRESS |
|---|---|---|
| Director | *Attached* | |
| Director | | |
| Director | | |
| President | | |
| Vice President | | |
| Secretary | | |
| Treasurer | | |

(left margin: ATTACH PAYMENT HERE)

**DOMESTIC PROFIT CORPORATIONS ANSWER ARTICLES 8 AND 9 (Foreign corporations disregard articles 8 and 9)**

8. Aggregate number of shares corporation has authority to issue

| NO. OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR WITHOUT PAR |
|---|---|---|---|
| | | | |

9. Aggregate number of shares issued

| NO. OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR WITHOUT PAR |
|---|---|---|---|
| | | | |

**FOREIGN PROFIT CORPORATIONS ANSWER ARTICLES 10 THRU 12 (Do not apply to domestic corporations)**

10. Date organized     *9/14/1999*

11. Term of existence authorized

    ☑ perpetual     Limited to _____ years

12. Is corporation in good standing in State in which organized?

    ☑ Yes     ☐ No

    *Deleware*

**PROFESSIONAL CORPORATIONS SEE SPECIAL INSTRUCTIONS ON BACK**

Date    *10/31/2007*

CORPORATE SEAL

By _____ (signature)

Its    ☐ Pres.     ☐ Vice Pres.     ☒ Sec'y

      ☐ Asst. Sec'y     ☐ Treas.     ☐ Asst. Treas.

A fee of $50.00 will be charged
for dishonored checks

(non-profit corporation
only)

FILED

**Name and address of Sole Director and Officers**

Sole Director:
Thomas Riesinger, Kilianstraße 237, 90411 Nürnberg, Germany

CEO and President:
see Sole Director

CFO and Secretary:
Sylvia Weber, Lerchenstraße 13, 90562 Heroldsberg, Germany

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS



# C E R T I F I C A T E

**THIS IS TO CERTIFY**  that the attached is a true and correct copy of the documents for this entity as shown by the records of this office.

*NAWA USA, INC.*

**IN TESTIMONY WHEREOF**  I have hereunto set my hand and caused the seal of this office to be affixed this **20th** day of **November , 2007** .

LINDA K. ARGO
Director

PATRICIA E. GRAYS
Superintendent of Corporations
Corporations Division

Adrian M. Fenty
Mayor

BRA-25 (10/96)

File Number_____

★ ★ ★
GOVERNMENT
OF THE
DISTRICT OF COLUMBIA

# TWO-YEAR REPORT FOR FOREIGN AND DOMESTIC BUSINESS CORPORATIONS

## DUE APRIL 15th

| | |
|---|---|
| Filing Fee $ 250 | |
| Penalty | PAID |
| Interest | |
| Total   $ 335 | |

RETAIN A COPY FOR YOUR RECORDS
SEE REVERSE SIDE FOR FILING FEES, PENALTIES, ETC.
MAKE CHECK PAYABLE TO D.C. TREASURER
MAIL REPORT TO : DEPT. OF CONSUMER AND REGULATORY AFFAIRS
BUSINESS REGULATION ADMINISTRATION, CORPORATIONS DIVISION
P.O. BOX 92300, WASHINGTON, D.C. 20090

Indicate if corporation is

☐ Domestic Profit

☐ Foreign Profit

1. Name of Corporation
*NAWA USA Inc.*

2. Organized under the laws of (insert District of Columbia, State or Country)
*Delaware*

3. If a foreign corporation, the address of its principal office in the state or Country where organized
*1875 I Street N.W Wash DC. 20006*

4. Name of registered agent and address of registered office in the District of Columbia (Do not make change of agent or address on this form)
*Corporate Creations Network Inc 1629 K Street Wash DC 20006*

5. Brief statement of business or affairs conducted in the District of Columbia
*Sale of Pharmaceuticals and technology*

6. If a domestic profit corporation, the address including street and number, of principal office in the District of Columbia
*1875 I Street NW Wash D.C. 20006*

7. Name and address, including street and number of directors and officers

ATTACH PAYMENT HERE

| | NAME | ADDRESS |
|---|---|---|
| Director | *Attached* | |
| Director | | |
| Director | | |
| President | | |
| Vice President | | |
| Secretary | | |
| Treasurer | | |

## DOMESTIC PROFIT CORPORATIONS ANSWER ARTICLES 8 AND 9 (Foreign corporations disregard articles 8 and 9)

| 8. Aggregate number of shares corporation has authority to issue | | | | 9. Aggregate number of shares issued | | | |
|---|---|---|---|---|---|---|---|
| NO. OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR WITHOUT PAR | NO. OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR WITHOUT PAR |
| | | | | | | | |

## FOREIGN PROFIT CORPORATIONS ANSWER ARTICLES 10 THRU 12 (Do not apply to domestic corporations)

10. Date organized *9/14/1999*

11. Term of existence authorized
☑ perpetual   Limited to _____ years

12. Is corporation in good standing in State in which organized?
☑ Yes   ☐ No

*Deleware*

## PROFESSIONAL CORPORATIONS SEE SPECIAL INSTRUCTIONS ON BACK

Date *10/31/2007*

CORPORATE SEAL

By _____ (signature)

Its

| | | |
|---|---|---|
| ☐ Pres. | ☐ Vice Pres. | ☒ Sec'y |
| ☐ Asst. Sec'y | ☐ Treas. | ☐ Asst. Treas. (non-profit corporation only) |

A fee of $50.00 will be charged for dishonored checks

FILED

**Name and address of Sole Director and Officers**

<u>Sole Director:</u>
Thomas Riesinger, Kilianstraße 237, 90411 Nürnberg, Germany

<u>CEO and President:</u>
see Sole Director

<u>CFO and Secretary:</u>
Sylvia Weber, Lerchenstraße 13, 90562 Heroldsberg, Germany

BRA-25 (10/96)

File Number ____________

GOVERNMENT OF THE DISTRICT OF COLUMBIA

# TWO-YEAR REPORT FOR FOREIGN AND DOMESTIC BUSINESS CORPORATIONS

**DUE APRIL 15th**

Filing Fee $ ______ PAID

Penalty ______

Interest ______

Total $ 320.00

RETAIN A COPY FOR YOUR RECORDS
SEE REVERSE SIDE FOR FILING FEES, PENALTIES, ETC.
MAKE CHECK PAYABLE TO D.C. TREASURER
MAIL REPORT TO : DEPT. OF CONSUMER AND REGULATORY AFFAIRS
BUSINESS REGULATION ADMINISTRATION, CORPORATIONS DIVISION
P.O. BOX 92300, WASHINGTON, D.C. 20090

Indicate if corporation is

☐ Domestic Profit

☐ Foreign Profit

1. Name of Corporation

NAWA USA Inc.

2. Organized under the laws of (insert District of Columbia, State or Country)

Delaware

3. If a foreign corporation, the address of its principal office in the state or Country where organized

1875 I Street N.W.
Washington D.C. 2006

4. Name of registered agent and address of registered office in the District of Columbia (Do not make change of agent or address on this form)

Corporate Creations Network Inc.

1629 K Street N.W.
Washington D.C. 20006

5. Brief statement of business or affairs conducted in the District of Columbia

Sale of Pharmaceuticals and Medical Technology

6. If a domestic profit corporation, the address including street and number, of principal office in the District of Columbia

1875 I Street N.W.
Washington D.C. 20006

ATTACH PAYMENT HERE

7. Name and address, including street and number of directors and officers

| | NAME | ADDRESS |
|---|---|---|
| Director | Attached. | |
| Director | | |
| Director | | |
| President | | |
| Vice President | | |
| Secretary | | |
| Treasurer | | |

## DOMESTIC PROFIT CORPORATIONS ANSWER ARTICLES 8 AND 9 (Foreign corporations disregard articles 8 and 9)

8. Aggregate number of shares corporation has authority to issue

| NO. OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR WITHOUT PAR |
|---|---|---|---|

9. Aggregate number of shares issued

| NO. OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR WITHOUT PAR |
|---|---|---|---|

## FOREIGN PROFIT CORPORATIONS ANSWER ARTICLES 10 THRU 12 (Do not apply to domestic corporations)

10. Date organized

9/14/99

11. Term of existence authorized

☒ perpetual Limited to ____________ years

12. Is corporation in good standing in State in which organized?

☒ Yes ☐ No

## PROFESSIONAL CORPORATIONS SEE SPECIAL INSTRUCTIONS ON BACK

Date 10/31/2007

By [signature] (signature)

CORPORATE SEAL

Its ☐ Pres. ☐ Vice Pres. ☒ Sec'y

☐ Asst. Sec'y ☐ Treas. ☐ Asst. Treas. (non-profit corporation only)

A fee of $50.00 will be charged for dishonored checks

FILED

By PAID

(Over)

**Name and address of Sole Director and Officers**

<u>Sole Director:</u>
Thomas Riesinger, Kilianstraße 237, 90411 Nürnberg, Germany

<u>CEO and President:</u>
see Sole Director

<u>CFO and Secretary:</u>
Sylvia Weber, Lerchenstraße 13, 90562 Heroldsberg, Germany

★ ★ ★ GOVERNMENT
OF THE
DISTRICT OF COLUMBIA

Department of Consumer and Regulatory Affairs
Business and Professional License Administration
Corporation Division
941 North Capitol St. N.E.
Washington, D.C. 20002

BRA 29 (REV 09/02)

# Billing Voucher

Charge To:

**NAWA USA, INC.**

*D.C. TREASURER*

Office Use Only

| | | 3222 |
|---|---|---|
| Charge For: **BUSINESS TWO-YEAR REPORT**    QTY: **1** | $    325.00 | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

| Date **1/2/2008** | | PAY THIS AMOUNT PAYABLE TO THE D.C. TREASURER | $    325.00 | Total |
|---|---|---|---|---|

★ ★ ★ GOVERNMENT
OF THE
DISTRICT OF COLUMBIA

Department of Consumer and Regulatory Affairs
Business and Professional License Administration
Corporation Division
941 North Capitol St. N.E.
Washington, D.C. 20002

BRA 29 (REV 09/02)

# Billing Voucher

Charge To:

**NAWA USA, INC.**

*D.C. TREASURER*

Office Use Only

|  |  |  | 3222 |
|---|---|---|---|
| Charge For: **BUSINESS AUTHORITY** | QTY: 1 | $ 200.00 |  |
| **BUSINESS TWO-YEAR REPORT** | 2 | $ 650.00 |  |
|  | 1 | $ |  |
|  | 1 | $ |  |

| Date **11/20/2007** |  | PAY THIS AMOUNT PAYABLE TO THE D.C. TREASURER | $ 850.00 | **Total** |
|---|---|---|---|---|

★ ★ ★ GOVERNMENT
OF THE

Department of Consumer and Regulatory Affairs

EXHIBIT C

22/07 03 DI 17:44 FAX                                                      @003

### State of Delaware

### Office of the Secretary of State          PAGE 1

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF INCORPORATION OF "NAWA USA, INC.",

FILED IN THIS OFFICE ON THE FOURTEENTH DAY OF SEPTEMBER, A.D.

1999, AT 9 O'CLOCK A.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE

NEW CASTLE COUNTY RECORDER OF DEEDS.



Edward J. Freel, Secretary of State

3095829  8100                          AUTHENTICATION:    9969876

991382494                                      DATE:    09-15-99

06 1150

# FILED

JUN 2 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

22/07 03 DI 17:44 FAX                                                    @004

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 09/14/1999
991382494 - 3095829

CERTIFICATE OF INCORPORATION

OF

NAWA USA, INC.

FIRST.  The name of this corporation shall be:

NAWA USA, INC.

SECOND.  Its registered office in the State of Delaware
is to be located at 1013 Centre Road, in the City of
Wilmington, County of New Castle, 19805, and its registered
agent at such address is THE COMPANY CORPORATION.

THIRD.  The purpose or purposes of the corporation shall
be: To engage in any lawful act or activity for which
corporations may be organized under the General Corporation
Law of Delaware.

FOURTH.  The total number of shares of stock which this
corporation is authorized to issue is:

Ten Million (10,000,000) shares with a par value of One
Tenth of One Mil ($0.0001) per share, amounting to One
Thousand Dollars ($1,000.00).

FIFTH.  The name and mailing address of the incorporator
is as follows:

Chennell Mowbray
The Company Corporation
1013 Centre Road
Wilmington, DE  19805

SIXTH.  The Board of Directors shall have the power to
adopt, amend or repeal the by-laws.

IN WITNESS WHEREOF, The undersigned, being the
incorporator hereinbefore named, has executed, signed and
acknowledged this certificate of incorporation this
thirteenth day of September, A.D. 1999.

Chennell Mowbray
Incorporator

EXHIBIT D

22/07 03 DI 17:46 FAX                                                    @008

# BYLAWS OF NAWA USA, INC.

### (A Delaware Corporation)

## ARTICLE I: CORPORATE OFFICES

**1.1   REGISTERED OFFICE** The registered office of the corporation shall be fixed in the certificate of incorporation of the corporation.

**1.2   OTHER OFFICES** The board of directors may at any time establish branch or subordinate offices at any place/s where the corporation is qualified to do business.

## ARTICLE II: MEETINGS OF STOCKHOLDERS

**2.1   PLACE OF MEETINGS.** Meetings of stockholders shall be held at any place within or outside the State of Delaware designated by the board of directors. In the absence of any such designation, stockholders' meetings shall be held at the principal executive office of the corporation.

**2.2   ANNUAL MEETING.** The annual meeting of stockholders shall be held each year on a date and at a time as may be designated from time to time by the board of directors.

**2.3   SPECIAL MEETING.** A special meeting of the stockholders may be called at any time but only by a duly constituted majority of the board of directors or by the president of the corporation.

**2.4   NOTICE OF MEETINGS.** All notices of meetings of stockholders shall be given in accordance with Section 2.6 of these bylaws not less than 10 nor more than 60 days before the date of the meeting. The notice shall specify the place, date and hour of the meeting and (i) in the case of a special meeting, the purpose or purposes for which the meeting is called (no business other than that specified in the notice may be transacted) or (ii) in the case of the annual meeting, those matters which the board of directors, at the time of giving the notice, intends to present for action by the stockholders (but any proper matter may be presented at the meeting for such action). Notice of any meeting at which directors are to be elected shall include the name of any nominee who, at the time of the notice, the board intends to present for election.

**2.5   ADVANCE NOTICE OF STOCKHOLDER NOMINEES AND BUSINESS.** Subject to the rights of holders of any class or series of stock having a preference over the common stock as to dividends or upon liquidation, (a) nominations for the election of directors, and (b) business proposed to be brought before any stockholder meeting, may be proposed by the board of directors or by any stockholder entitled to vote in the election of directors generally if such nomination or business proposed is otherwise

1

06 1150
# FILED

JUN 2 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

proper business before such meeting. However, any such stockholder may nominate one or more persons for election as directors at or propose business to be brought before a meeting only if such stockholder has given timely and proper written notice of his intent to make such nomination or to propose such business. To be timely, such notice must be received at the principal executive offices of the corporation not less than (i) 120 calendar days in advance of the date specified in the corporation's proxy statement released to stockholders in connection with the previous year's annual meeting of stockholders, or (ii) in the event that no annual meeting was held in the previous year or the date of the annual meeting has been changed by more than 30 days from the date contemplated at the time of the previous year's proxy statement, then within a reasonable time before the solicitation is made. To be in proper form, such notice shall directed to the president or the secretary and shall set forth: (i) the name and address of the stockholder who intends to make the nominations or propose the business and, as the case may be, of the person or persons to be nominated or of the business to be proposed; (ii) a representation that the stockholder is a holder of record of stock of the corporation entitled to vote at such meeting and, if applicable, intends to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice; (iii) if applicable, a description of all arrangements or understandings between the stockholder and each nominee and any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the stockholder; (iv) such other information regarding each nominee or each matter of business to be proposed by such stockholder as would be required to be included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission had the nominee been or intended to be nominated, or the matter been or intended to be proposed by the board of directors; and (v) if applicable, the consent of each nominee to serve as director of the corporation if so elected. The chairman of the meeting shall refuse to acknowledge the nomination of any person or the proposal of any business not *made in compliance with the foregoing procedure.*

2.6   **NOTICE.** Written notice of any meeting of stockholders shall be given either personally or by first-class mail or by telegraphic or other written communication. Notices not personally delivered shall be sent charges prepaid and shall be addressed to the stockholder at the address of that stockholder appearing on the books of the corporation or given by the stockholder to the corporation for the purpose of notice. Notice shall be deemed to have been given at the time when delivered personally or deposited in the mail or sent by telegram or other means of written communication. An affidavit of the mailing or other means of giving any notice of any stockholders' meeting, executed by the secretary, assistant secretary or any transfer agent of the corporation giving the notice, shall be prima facie evidence of the giving of such notice.

2.7   **QUORUM** The holders of a one-third in voting power of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation. If, however, such quorum is not present or represented at any meeting of the stockholders,

then either (i) the chairman of the meeting or (ii) the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting in accordance with Section 2.8 of these bylaws. When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which, by express provision of the laws of the State of Delaware or of the certificate of incorporation or these bylaws, a different vote is required, in which case such express provision shall govern and control the decision of the question. If a quorum be initially present, the stockholders may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum, if any action taken is approved by a majority of the stockholders initially constituting the quorum.

2.8  ADJOURNED MEETING; NOTICE When a meeting is adjourned to another time and place, unless these bylaws otherwise require, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the corporation may transact any business that might have been transacted at the original meeting. If the adjournment is for more than 30 days or, if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2.9  VOTING. The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of Section 2.11 of these bylaws, subject to the provisions of Sections 217 and 218 of the General Corporation Law of Delaware (relating to voting rights of fiduciaries, pledgors and joint owners, and to voting trusts and other voting agreements). Except as may be otherwise provided in the certificate of incorporation or these bylaws, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder and stockholders shall not be entitled to cumulate their votes in the election of directors or with respect to any matter submitted to a vote of the stockholders.

2.10  ACTION BY WRITTEN CONSENT. Unless otherwise provided in the certificate of incorporation, any action required or permitted to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

2.11 RECORD DATE FOR STOCKHOLDER NOTICE; VOTING. For purposes of determining the stockholders entitled to notice of any meeting or to vote thereat, the board of directors may fix, in advance, a record date, which shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors and which shall not be more than 60 days nor less than 10 days before the date of any such

3

meeting. In such event, only stockholders of record on the date so fixed are entitled to notice and to vote, notwithstanding any transfer of any shares on the books of the corporation after the record date. If the board of directors does not so fix a record date, such record date shall be at the close of business on the business day immediately preceding the day on which notice is given or, if notice is waived, at the close of business on the business day immediately preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting unless the board of directors fixes a new record date for the adjourned meeting, but the board of directors shall fix a new record date if the meeting is adjourned for more than 30 days from the date set for the original meeting. The record date for any other purpose shall be as provided in Section 8.1 of these bylaws.

**2.12  PROXIES.** Every person entitled to vote for directors, or on any other matter, shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the secretary of the corporation, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be deemed signed if the stockholder's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, telecopy or otherwise) by the stockholder or the stockholder's attorney-in-fact. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212(e) of the General Corporation Law of Delaware.

**2.13  ORGANIZATION.** The chairman of the board or in the absence of chairman then the president or, in the absence of the president and the chairman of the board, one of the corporation's vice presidents, shall call the meeting of stockholders to order, and shall act as chairman of the meeting. In the absence of the president, the chairman of the board and all of the vice presidents, the stockholders shall appoint a chairman for such meeting. The chairman of any meeting of stockholders shall determine the order of business and the procedures at the meeting, including such matters as the regulation of the manner of voting and the conduct of business. The secretary of the corporation shall act as secretary of all meetings of the stockholders, but in the absence of the secretary, the chairman of the meeting may appoint any person to act as secretary of the meeting.

**2.14  LIST OF STOCKHOLDERS ENTITLED TO VOTE.** The officer who has charge of the stock ledger of the corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least 10 days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list

4

shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

2.15  WAIVER OF NOTICE. Whenever notice is required to be given under any provision of the General Corporation Law of Delaware or of the certificate of incorporation or these bylaws, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice unless so required by the certificate of incorporation or these bylaws.

## ARTICLE III: DIRECTORS

3.1  POWERS. Subject to the provisions of the General Corporation Law of Delaware and to any limitations in the certificate of incorporation or these bylaws relating to action required to be approved by the stockholders, the business and affairs of the corporation shall be managed by or under the direction of the board of directors.

3.2  NUMBER OF DIRECTORS. The board of directors shall consist of up to five members. The number of directors may be changed by an amendment to this bylaw, duly adopted by the board of directors or by the stockholders, or by a duly adopted amendment to the certificate of incorporation.

3.3  *ELECTION AND TERM OF OFFICE OF DIRECTORS.* Except as provided in Section 3.4 of these bylaws, directors shall be elected at each annual meeting of stockholders to hold office as provided in Section 3.2 of these bylaws. Each director, including a director elected or appointed to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified. The board of directors shall select from among its members, by majority vote of the full number of authorized directors, one director who shall serve as chairman of the board so long as such chairman remains a member of the board but in all events subject to dismissal or replacement as chairman at any time by the board, by majority vote of the full number of authorized directors

3.4  RESIGNATION AND VACANCIES. Any director may resign effective on giving written notice to the chairman of the board, the president, the secretary or the board of directors, unless the notice specifies a later time for that resignation to become effective. If the resignation of a director is effective at a future time, the board of directors may elect a successor to take office when the resignation becomes effective. Unless otherwise provided in the certificate of incorporation or these bylaws, vacancies and newly created directorships resulting from any increase in the authorized number of

5

directors may be filled by a majority of the remaining directors, even if less than a quorum, or by a sole remaining director; however, a vacancy created by the removal of a director by the vote of the stockholders or by court order may be filled only by the affirmative vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute a majority of the required quorum).

**3.5   REMOVAL OF DIRECTORS.** Unless otherwise restricted by statute, by the certificate of incorporation or by these bylaws, any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.

**3.6   PLACE OF MEETINGS; MEETINGS BY TELEPHONE.** Regular meetings of the board of directors may be held at any place within or outside the State of Delaware that has been designated from time to time by resolution of the board or in the absence of such a designation, at the principal executive office of the corporation. Special meetings of the board may be held at any place within or outside the State of Delaware that has been designated in the notice of the meeting or, if not stated in or if there is no notice, at the principal executive office of the corporation. Any meeting, regular or special, may be held by conference telephone or similar communication equipment, so long as all directors participating can hear one another; and all such participating directors shall be deemed to be present in person at the meeting.

**3.7   REGULAR MEETINGS.** Regular meetings of the board of directors may be held without notice at such time as shall from time to time be determined by the board of directors. If any regular meeting day shall fall on a legal holiday, then the meeting shall be held at the same time and place on the next succeeding full business day.

**3.8   SPECIAL MEETINGS; NOTICE.** Special meetings of the board of directors for any purpose or purposes may be called at any time by the chairman of the board, the president, any vice president, the secretary or any two directors. Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail, telecopy or telegram, charges prepaid, addressed to each director at that director's address as it is shown on the records of the corporation. If the notice is mailed, it shall be deposited in the United States mail at least 10 days before the time of the holding of the meeting. If the notice is delivered personally or by telephone, telecopy or telegram, it shall be delivered personally or by telephone or to the telegraph company at least 48 hours before the time of the holding of the meeting. Any oral notice given personally or by telephone may be communicated either to the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director. The notice need not specify the purpose of the meeting.

6

**3.9  QUORUM.** A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn as provided in Section 3.11 of these bylaws. Every act or decision done or made by a majority of the directors present at a duly held meeting at which a quorum is present shall be regarded as the act of the board of directors, subject to the provisions of the certificate of incorporation and applicable law. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the quorum for that meeting.

**3.10  WAIVER OF NOTICE.** Notice of a meeting need not be given to any director (i) who signs a waiver of notice, whether before or after the meeting, or (ii) who attends the meeting other than for the express purposed of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. All such waivers shall be filed with the corporate records or made part of the minutes of the meeting. A waiver of notice need not specify the purpose of any regular or special meeting of the board of directors.

**3.11  ADJOURNMENT.** A majority of the directors present, whether or not constituting a quorum, may adjourn any meeting of the board to another time and place.

**3.12  NOTICE OF ADJOURNMENT.** Notice of the time and place of holding an adjourned meeting of the board need not be given unless the meeting is adjourned for more than 24 hours. If the meeting is adjourned for more than 24 hours, then notice of the time and place of the adjourned meeting shall be given before the adjourned meeting takes place, in the manner specified in Section 3.8 of these bylaws, to the directors who were not present at the time of the adjournment.

**3.13  BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING.** Any action required or permitted to be taken by the board of directors may be taken without a meeting, provided that all members of the board consent in writing to that action. Such action by unanimous written consent shall have the same force and effect as a unanimous vote of the board of directors. Such written consent and any counterparts thereof shall be filed with the minutes of the proceedings of the board of directors.

**3.14  FEES AND COMPENSATION OF DIRECTORS.** Directors and members of committees may receive such compensation, if any, for their services and such reimbursement of expenses as may be fixed or determined by resolution of the board of directors. This Section 3.15 shall not be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee or otherwise and receiving compensation for those services.

**3.15  APPROVAL OF LOANS TO OFFICERS.** The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or any of its subsidiaries, including any officer or employee who is a

7

director of the corporation or any of its subsidiaries, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation. The loan, guaranty or other assistance may be with or without interest and may be unsecured, or secured in such manner as the board of directors shall approve, including, without limitation, a pledge of shares of stock of the corporation. Nothing contained in this section shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

**3.16  SOLE DIRECTOR.** In the event only one director is required by these bylaws or the certificate of incorporation, then any reference herein to notices, waivers, consents, meetings or other actions by a majority or quorum of the directors shall be deemed to refer to such action by such sole director who shall have all the rights and duties and shall be entitled to exercise all of the powers and shall assume all the responsibilities otherwise given to the board of directors.

## ARTICLE IV COMMITTEES

**4.1  COMMITTEES OF DIRECTORS.** The board of directors may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two or more directors, to serve at the pleasure of the board. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. The appointment of members or alternate members of a committee requires the vote of a majority of the authorized number of directors. Any committee, to the extent provided in the resolution of the board, shall have and may exercise all the powers and authority of the board but no such committee shall have the power or authority to (i) amend the certificate of incorporation, (ii) adopt an agreement of merger or consolidation under Sections 251 or 252 of the General Corporation Law of Delaware, (iii) recommend to the stockholders the sale, lease or exchange of all or substantially all of the corporation's property and assets, (iv) recommend to the stockholders a dissolution of the corporation or a revocation of a dissolution, (v) amend the bylaws of the corporation; or (vi) declare a dividend, authorize the issuance of stock, or adopt a certificate of ownership and merger pursuant to Section 253 of the General Corporation Law of Delaware.

**4.2  RULES OF COMMITTEES.** The board of directors may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws. In the absence of but so long as not inconsistent with such rules or these bylaws, each committee may prescribe its own rules for calling and holding meetings and its method of procedure.

**4.3  COMMITTEE MINUTES.** Each committee shall keep regular minutes of its meetings and report the same to the board of directors when required.

## ARTICLE V: OFFICERS

8

5.1  **OFFICERS.** The corporate officers of the corporation shall be each of a (i) president and chief executive officer, (ii) vice president and chief operating officer, and (iii) treasurer and chief financial officer, and (iv) secretary. Any number of offices may be held by the same person. The corporation may also have, at the discretion of the board of directors, additional vice presidents (however denominated), one or more assistant secretaries and assistant treasurers together with such other officers as may be appointed in accordance with the provisions of Section 5.3 of these bylaws. In addition to the corporate officers of the corporation described above, there may also be such administrative officers of the corporation as may be designated and appointed from time to time by the president of the corporation in accordance with the provisions of Section 5.12 of these bylaws.

5.2  **ELECTION OF OFFICERS.** The corporate officers of the corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 or Section 5.5 of these bylaws, shall be chosen by the board of directors, subject to the rights, if any, of an officer under any contract of employment, and shall hold their respective offices for such terms as the board of directors may from time to time determine.

5.3  **SUBORDINATE OFFICERS.** The board of directors may appoint, or may empower the president to appoint, such other corporate officers as the business of the corporation may require, each of whom shall hold office for such period, have such power and authority, and perform such duties as are provided in these bylaws or as the board of directors may from time to time determine. The president may from time to time designate and appoint administrative officers of the corporation in accordance with the provisions of Section 5.12 of these bylaws.

5.4  **REMOVAL AND RESIGNATION OF OFFICERS.** Subject to the rights, if any, of a corporate officer under any contract of employment, any corporate officer may be removed, either with or without cause, by the board of directors at any regular or special meeting of the board or, except in case of a corporate officer chosen by the board of directors, by any corporate officer upon whom such power of removal may be conferred by the board of directors. Any corporate officer may resign at any time by giving written notice to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the corporate officer is a party. Any administrative officer designated and appointed by the president may be removed, either with or without cause, at any time by the president. Any administrative officer may resign at any time by giving written notice to the president or to the secretary of the corporation.

9

**5.5   VACANCIES.** A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these bylaws for regular appointments to that office.

**5.6   AUTHORITY OF CORPORATE OFFICERS.** The president shall be the chief executive officer of the corporation and, subject to the control of the board of directors, shall have general responsibility for and supervision, direction and control of the business and all other corporate officers of the corporation. He or she shall preside at all meetings of the stockholders and, in the absence or nonexistence of a chairman of the board, at all meetings of the board of directors. He or she shall have the general powers and duties of management usually vested in the office of president of a corporation, and shall have such other powers and perform such other duties as may be prescribed by the board of directors or these bylaws. All other corporate officers shall have such authority and responsibility as is customarily incident to their respective offices, except as may be otherwise or in addition provided periodically by the board of directors or the president.

## ARTICLE VI: INDEMNIFICATION

**6.1   INDEMNIFICATION OF DIRECTORS AND OFFICERS.** The corporation shall, to the maximum extent and in the manner permitted by the General Corporation Law of Delaware, as now exists or may hereafter be amended, indemnify any person against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with any threatened, pending or completed action, suit, or proceeding in which such person was or is a party or is threatened to be made a party by reason of the fact that such person is or was a director or officer of the corporation. For purposes of this Section 6.1, a "director" or "officer" of the corporation shall mean any person (i) who is or was a director or officer of the corporation, (ii) who is or was serving at the request of the corporation as a director or officer of another corporation or other enterprise, or (iii) who was a director or officer of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation. The corporation shall be required to indemnify a director or officer in connection with an action, suit, or proceeding (or part thereof) initiated by such director or officer only if the initiation of such action, suit, or proceeding (or part thereof) by the director or officer was authorized by the board of directors of the corporation. The rights conferred on any person by this Article shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the corporation's Certificate of Incorporation, these bylaws, agreement, vote of the stockholders or disinterested directors or otherwise. Any repeal or modification of the foregoing provisions of this Article shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

**6.2   INDEMNIFICATION OF OTHERS.** The corporation shall have the power, to the maximum extent and in the manner permitted by the General Corporation Law of Delaware as the same now exists or may hereafter be amended, to indemnify any person

10

(other than directors and officers) against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with any threatened, pending or completed action, suit, or proceeding, in which such person was or is a party or is threatened to be made a party by reason of the fact that such person is or was an employee or agent of the corporation. For purposes of this Section 6.2, an "employee" or "agent" of the corporation (other than a director or officer) shall mean any person (i) who is or was an employee or agent of the corporation, (ii) who is or was serving at the request of the corporation as an employee or agent of another corporation or other enterprise, or (iii) who was an employee or agent of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation.

6.3   INSURANCE. The corporation may maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the corporation would have the power to indemnify him or her against such liability under the provisions of the General Corporation Law of Delaware.

### ARTICLE VII: RECORDS AND REPORTS

7.1   MAINTENANCE AND INSPECTION OF RECORDS. The corporation shall, either at its principal executive office or at such place or places as designated by the board of directors, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these bylaws as amended to date, accounting books and other records of its business and properties. Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the corporation at its registered office in Delaware or at its principal place of business.

7.2   INSPECTION BY DIRECTORS. Any director shall have the right to examine and copy the corporation's stock ledger, a list of its stockholders and its other books and records for a purpose reasonably related to his or her position as a director.

7.3   ANNUAL STATEMENT TO STOCKHOLDERS. The board of directors shall present at each annual meeting, and at any special meeting of the stockholders when

11

22/07 03  DI  17:51 FAX                                                    ☒019

called for by vote of the stockholders, a full and clear statement of the business and condition of the corporation.

**7.4   REPRESENTATION OF SHARES OF OTHER CORPORATIONS.** The chairman of the board, if any, the president, any vice president, the chief financial officer, the secretary or any assistant secretary of this corporation, or any other person authorized by the board of directors or the president or a vice president, is authorized to vote, represent and exercise on behalf of this corporation all rights incident to any and all shares of the stock of any other corporation or corporations standing in the name of this corporation. The authority herein granted may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

**7.5   CERTIFICATION AND INSPECTION OF BYLAWS.** The original or a copy of these bylaws, as amended to date, certified by the secretary, shall be kept at the corporation's principal executive office and shall be open to inspection by the stockholders of the corporation, at all reasonable times during office hours.

## ARTICLE VIII: GENERAL MATTERS

**8.1   RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND VOTING.** For purposes of determining the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the board of directors may fix, in advance, a record date, which shall not precede the date upon which the resolution fixing the record date is adopted and which shall not be more than 60 days before any such action. In that case, only stockholders of record at the close of business on the date so fixed are entitled to receive the dividend, distribution or allotment of rights, or to exercise such rights, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date so fixed, except as otherwise provided by law. If the board of directors does not so fix a record date, then the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the applicable resolution.

**8.2   AUTHORIZED SIGNATORIES.** From time to time, the board of directors shall determine by resolution which person or persons may sign all checks or other evidences of indebtedness of the corporation or enter into any contract or execute any instrument in the name of and on behalf of the corporation. Only the persons so authorized shall sign or endorse those instruments. Unless so authorized or ratified by the board of directors, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

12

8.3  STOCK CERTIFICATES. PARTLY PAID SHARES. The shares of the corporation shall be represented by certificates, provided that the board of directors of the corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the corporation. Notwithstanding the adoption of such a resolution by the board of directors, every holder of stock represented by certificates and, upon request, every holder of uncertificated shares, shall be entitled to have a certificate signed by, or in the name of the corporation by the president or vice-president, and by the treasurer or an assistant treasurer, or the secretary or an assistant secretary, representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

8.4  TRANSFER. Upon surrender to the secretary or transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

8.5  PARTLY PAID SHARES. The corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly paid shares, or upon the books and records of the corporation in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully paid shares, the corporation shall declare a dividend upon partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

8.6  SPECIAL DESIGNATION ON CERTIFICATES. If the corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the corporation shall issue to represent such class or series of stock; provided, however, that, except as otherwise provided in Section 202 of the General Corporation Law of Delaware, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the corporation shall issue to represent such class or series of stock a statement that the corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences and the relative, participating, optional or

other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

8.7  LOST CERTIFICATES. Except as provided in this Section 8.7, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the corporation and canceled at the same time. The board of directors may, in case any share certificate or certificate for any other security is lost, stolen or destroyed, authorize the issuance of replacement certificates on such terms and conditions as the board may require; the board may require indemnification of the corporation secured by a bond or other adequate security sufficient to protect the corporation against any claim that may be made against it, including any expense or liability, on account of the alleged loss, theft or destruction of the certificate or the issuance of the replacement certificate.

8.8  TRANSFER AGENTS AND REGISTRARS. The board of directors may appoint one or more transfer agents or transfer clerks, and one or more registrars, each of which shall be an incorporated bank or trust company — either domestic or foreign, who shall be appointed at such times and places as the requirements of the corporation may necessitate and the board of directors may designate.

8.9  CONSTRUCTION; DEFINITIONS. Unless the context requires otherwise, the general provisions, rules of construction and definitions in the General Corporation Law of Delaware shall govern the construction of these bylaws. Without limiting the generality of this provision, as used in these bylaws, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both an entity and a natural person.

### ARTICLE IX: AMENDMENTS

The original or other bylaws of the corporation may be adopted, amended or repealed by the stockholders entitled to vote or by the board of directors of the corporation. The fact that such power has been so conferred upon the directors shall not divest the stockholders of the power, nor limit their power to adopt, amend or repeal bylaws. Whenever an amendment or new bylaw is adopted, it shall be copied in the book of bylaws with the original bylaws, in the appropriate place. If any bylaw is repealed, the fact of repeal with the date of the meeting at which the repeal was enacted or the filing of the operative written consent(s) shall be stated in said book.

14

# EXHIBIT E

## EMPLOYMENT AGREEMENT

Entered into as of January 1, 2000 ("Effective Date") between **PETER KANZLSPERGER**, residing at Armin-Knab-Str. 13, 94474 Vilshofen, Germany ("Employee"), and NAWA USA, INC., a company registered in Delaware and maintaining its principal office at 222 Munson Road, Wolcott, Connecticut 06716 ("Company").

## WITNESSETH

**WHEREAS:** NAWA is engaged in the development, manufacture and sale of pharmaceutical formulations and drugs for wound healing together with other pharmaceutical and/or cosmetic products for the sports healthcare market ("Company's Business"); and

**WHEREAS** The Company desires to employ Employee as its Vice President and Chief Operating Officer and Employee wishes to be so employed.

**NOW, THEREFORE**, in consideration of the premises and mutual agreements hereinafter contained, the parties hereto agree as follows:

1. **EMPLOYMENT**

   With effect from the Effective Date, the Company employs Employee and Employee accepts employment with the Company upon the terms and conditions set forth herein.

2. **DUTIES**

   2.1. The Company hereby engages Employee to serve as Vice President and Chief Operating Officer.

   2.2. Employee shall devote his full business time and attention to the Company's Business (including the various subsidiaries of the Company) and shall perform his duties diligently and promptly for the benefit of the Company. During his engagement hereunder, Employee shall not undertake or accept any other paid or unpaid employment or occupation or engage in or be associated with, directly or indirectly any other businesses, duties or pursuits except for de minimis non-commercial or non-business activities.

   2.3. Employee shall report regularly and at least once each month to the Board of Directors of the Company or as otherwise requested by the Board.

3. **TERM**

   3.1. Employee's employment under this Agreement shall commence on the Effective Date and shall end on the earliest of: (i) the death or disability (as defined herein) of Employee or termination of employment by the Company with cause (as defined herein); or (ii) three (3) years from the date of this

NAWA-PK-Employment Agreement - second draft.doc

06 1150

**FILED**

JUN 2 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

- 2 -

Agreement ("**Initial Term**"). In the event this Agreement continues until the expiration of the Initial Term, the term shall automatically be extended for additional 12 month periods ("**Extended Term**") unless either party gives the other notice of its intent to terminate this Agreement at least ninety (90) days prior to the expiration of the Initial Term or any Extended Term.

3.2.  For the purpose of this Agreement, "**disability**" shall mean any physical or mental illness or injury as a result of which Employee remains absent from work for a period of six successive months in any 18 month period. Disability shall occur upon the end of such six month period.

3.3.  For the purpose of this Agreement, "**cause**" shall exist if Employee (i) breaches any of the material terms or conditions hereof including, without limitation, the terms of paragraphs 10 and 11; (ii) engages in willful misconduct or acts in bad faith with respect to the Company in connection with and related to the employment hereunder; (iii) is convicted of a felony or is held liable by a court of competent jurisdiction for fraud against the Company; or (iv) fails to comply with the instructions of the Company's Board of Directors given in good faith, provided that, with respect to clauses (i) and (iv), if Employee has cured any such condition (that is reasonably susceptible to cure) within 30 business days of the advance notice (as defined herein) then "cause" shall be deemed not to exist. For purposes of this paragraph 3, "advance notice" shall constitute a written notice delivered to Employee that sets forth with particularly the facts and circumstances relied on by the Company as the basis for cause.

3.4.  During the period following notice of termination by any party for any reason, the Employee shall cooperate with the Company and use his best efforts to assist the integration into the Company organization of the person or persons who will assume Employee's responsibilities.

4.  **COMPENSATION**

4.1.  During the term hereof, and subject to the performance of the services required to be performed hereunder by Employee, the Company shall pay to Employee for all services rendered by Employee under this Agreement a salary, payable not less often than monthly and in accordance with the Company's normal and reasonable payroll practices, in a monthly gross amount of $6,500 exclusive of amounts payable by the Company for the social benefits set forth in paragraph 4.2 ("**Gross Salary**"). The Company shall annually consider increasing the Employee's Gross Salary, pursuant to its normal practices.

4.2  The Company shall secure and maintain for the benefit of Employee as is customary of a position of comparable rank in a company of comparable size based in Germany, subject to such employee contributions as are customary.

5.  **EXPENSES**

Employee is authorized to incur reasonable expenses for promoting the Business of the Company, including expenses for entertainment, travel, telephone, lodging and

- 2 -

Agreement ("Initial Term"). In the event this Agreement continues until the expiration of the Initial Term, the term shall automatically be extended for additional 12 month periods ("Extended Term") unless either party gives the other notice of its intent to terminate this Agreement at least ninety (90) days prior to the expiration of the Initial Term or any Extended Term.

3.2. For the purpose of this Agreement, "disability" shall mean any physical or mental illness or injury as a result of which Employee remains absent from work for a period of six successive months in any 18 month period. Disability shall occur upon the end of such six month period.

3.3. For the purpose of this Agreement, "cause" shall exist if Employee (i) breaches any of the material terms or conditions hereof including, without limitation, the terms of paragraphs 10 and 11; (ii) engages in willful misconduct or acts in bad faith with respect to the Company in connection with and related to the employment hereunder; (iii) is convicted of a felony or is held liable by a court of competent jurisdiction for fraud against the Company; or (iv) fails to comply with the instructions of the Company's Board of Directors given in good faith, provided that, with respect to clauses (i) and (iv), if Employee has cured any such condition (that is reasonably susceptible to cure) within 30 business days of the advance notice (as defined herein) then "cause" shall be deemed not to exist. For purposes of this paragraph 3, "advance notice" shall constitute a written notice delivered to Employee that sets forth with particularly the facts and circumstances relied on by the Company as the basis for cause.

3.4. During the period following notice of termination by any party for any reason, the Employee shall cooperate with the Company and use his best efforts to assist the integration into the Company organization of the person or persons who will assume Employee's responsibilities.

4. **COMPENSATION**

4.1. During the term hereof, and subject to the performance of the services required to be performed hereunder by Employee, the Company shall pay to Employee for all services rendered by Employee under this Agreement a salary, payable not less often than monthly and in accordance with the Company's normal and reasonable payroll practices, in a monthly gross amount of $6,500 exclusive of amounts payable by the Company for the social benefits set forth in paragraph 4.2 ("Gross Salary"). The Company shall annually consider increasing the Employee's Gross Salary, pursuant to its normal practices.

4.2 The Company shall secure and maintain for the benefit of Employee as is customary of a position of comparable rank in a company of comparable size based in Germany, subject to such employee contributions as are customary.

5. **EXPENSES**

Employee is authorized to incur reasonable expenses for promoting the Business of the Company, including expenses for entertainment, travel, telephone, lodging and

- 3 -

similar items commensurate with his status with the Company. The Company will reimburse Employee promptly for all such expenses upon presentation by Employee, from time to time, of an itemized account of expenditures. Per diem allowances and petty cash advances shall be in accordance with the Company's standard policy as agreed to by the Board of Directors of the Company from time to time.

6. **VACATION**

Employee shall be entitled to 25 working days of paid vacation during each year that this Agreement is in effect. Vacation time may be accumulated for no more than two years, after which the Company shall pay Employee for any unused accumulated vacation remaining.

7. **TERMINATION OF EMPLOYMENT**

   7.1.   In the event this Agreement is terminated during the Initial Term or any Extended Term, as defined in Section 3.1 above, in addition to any right to notice described herein, the Employee shall have the right to receive three months prior notice during which time Employee shall have the right to receive the Gross Salary and the benefits set forth in Section 4.2.

   7.2.   Employee's right to notice pursuant to this section shall apply only in the event this Agreement is terminated by the Company without cause, including exercise by the Company of notice of termination for any Extended Term. For purposes of this section, termination by Employee shall be deemed to be a termination by the Company in the event Employee terminates this Agreement due to the change in duties specified in section 2.1.

8. **SECRECY AND NONDISCLOSURE**

The Employee shall treat as secret and confidential all of the processes, methods, formulas, procedures, techniques, and other information which are not of public knowledge or record pertaining to the Company's Business (existing, potential and future), including without limitation, all business information relating to customers and suppliers and products of which the Employee becomes aware during and as a result of his employment or association with the Company. Employee shall not disclose, use, publish, or in any other manner reveal, directly or indirectly, at any time during or after the term of this Agreement, any such processes, methods, formulas, procedures, techniques, and other information pertaining to the Company's existing or future Business or products.

9. **NON-COMPETITION**

   9.1.   Employee agrees that during the term of this Agreement and any extensions hereof and for a period of two (2) years after he ceases to be employed by the Company he will not, directly or indirectly, for his own account or as an employee, officer, director, partner, joint venturer, shareholder, investor, consultant or otherwise (except as an investor in a corporation whose stock is publicly traded and in which Employee holds less than 5% of the outstanding

- 4 -

shares) interest himself in or engage in any business or enterprise that directly or indirectly competes with the Business of the Company, that exists now or in the future during the term of this Agreement or is proposed in writing by the Company, prior to the time of termination; provided that any such written proposal is provided to Employee within 30 days of the date of termination.

9.2.   Employee agrees that during a period of one year from termination of this Agreement or any extension hereof he shall not employ directly or indirectly any individual then employed by the Company.

9.3.   Employee acknowledges that the restricted period of time specified under paragraph 9.1 hereof are reasonable, in view of the nature of the business in which the Company is engaged and Employee's knowledge of the Company's Business and products.

9.4.   Notwithstanding anything contained in paragraph 9.2 and 9.3 to the contrary, if the period of time specified under paragraph 9.1 hereof should be determined to be unreasonable in any judicial proceeding, then the period of time shall be reduced so that this Agreement may be enforced in such area and during such period of time as shall be determined to be reasonable by such judicial proceeding.

## 10.   DEVELOPMENT RIGHTS

Employee agrees and declares that all proprietary information including but not limited to trade secrets and know-how, patents and other rights in connection therewith developed by or with the contribution of Employee's efforts during his employment by the Company and relating to the Company's Business shall be the sole property of the Company. Employee shall execute all documents necessary to assign any patents to the Company and otherwise transfer such proprietary rights to the Company, provided, however, that Employee shall be paid any amounts required under applicable Patent Law.

## 11.   EMPLOYEE REPRESENTATIONS

The Employee represents and warrants to the Company that the execution and delivery of this Agreement and the fulfillment of the terms hereof (i) will not constitute a default under or breach of any agreement or other instrument to which he is a party or by which he is bound, including without limitation, any confidentiality or non-competition agreement, (ii) do not require the consent of any person or entity, and (iii) shall not utilize during the term of his employment any proprietary information of any third party, including prior employers of the Employee.

## 12.   BENEFIT

Except as otherwise herein expressly provided, this Agreement shall inure to the benefit of and be binding upon the Company, its successors and assigns, including, without limitation, any subsidiary or affiliated entity and shall inure to the benefit of and be binding upon Employee, his heirs, executors, administrators and legal

- 5 -

representatives. Notwithstanding the foregoing, the obligations of Employee hereunder shall not be assignable or delegable.

13.    **ENTIRE AGREEMENT**

This Agreement constitutes the entire understanding and agreement between the parties hereto, supersedes any and all prior discussions, agreements and correspondence with regard to the subject matter hereof, and may not be amended, modified or supplemented in any respect, except by a subsequent writing executed by both parties hereto.

14.    **NOTICES**

All notices, requests and other communications to any party hereunder shall be given or made in writing and telecopies, mailed (by registered or certified mail) or delivered by hand to the respective party at the address set forth in the caption of this Agreement or to such other address (or telecopier number) as such party may hereafter specify for the purpose of notice to the other party hereto. Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified herein and the appropriate answerback is received or (ii) if given by any other means, when delivered at the address specified herein.

15.    **APPLICABLE LAW**

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to principles of conflicts of law and the courts of New York, state or federal, shall have exclusive jurisdiction over the parties hereto and subject matter hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first appearing above.

**NAWA USA, INC.**

By:    _____          _____
                                        **PETER KANZLSPERGER**

Name:    Thomas Riesinger

Title:    President and
            Chief Executive Officer

# EXHIBIT F

# NAWA USA, Inc.

## Minutes of the
## Annual Meeting of Directors

### February 20, 2002
### Womble, Carlyle, Sandridge, & Rice, PLLC
### 1401 Eye Street, N.W.
### Washington, D.C. 20005

In Attendance
Mr. Thomas Riesinger (**TR**) – Director, President, and CEO of NAWA USA, Inc.
Mr. Peter Kanzlsperger (**PK**) – Director, Vice-President, and COO of NAWA USA, Inc.
Mr. Bernd Stern (**BS**) – Director of NAWA USA, Inc.
Prof. Dr. Alexander Gaiger (**AG**) – Director of NAWA USA, Inc.
Dr. Hans-Georg Bottler (**H-GB**) – Director of NAWA USA, Inc.
Ms. Sylvia Weber (**SW**)– Treasurer, Secretary, and CFO of NAWA USA, Inc.
Ms. Barbara Kanzlsperger (**BK**) – Keeper of the minutes
Mr. Stanley J. Wrobel – Counsel to NAWA USA, Inc. (did not attend entire meeting)
Ms. Sabrina Ciccarello – Counsel to NAWA USA, Inc. (did not attend entire meeting)

Directors not present:
Mr. Ferdi Egli
Mr. Helmut Graf

Contact Address of the Directors
See attachment

Acting as chair of the meeting, Thomas Riesinger appointed Stanley Wrobel to act as moderator of the meeting. Mr. Wrobel then convened the Annual Meeting of Directors of NAWA USA, Inc. and welcomed all participants. Sylvia Weber, as secretary of NAWA, was given the responsibility of overseeing the preparation of the minutes for the meeting and the following agenda for the meeting was proposed and accepted by the directors in attendance:

1. Meeting called to order.
2. Confirmation of the presence of a quorum.
3. Election of officers.
4. Election of Chairman of the board.
5. Set schedule for regular directors' meetings.
6. Business Discussions.
7. Adjournment.

Confirmation of the presence of a quorum:

Sylvia Weber, as secretary of the company, verified that a majority of the 7 directors on the board must be present for the meeting in order for a quorum to be present. Since 5 directors were present in person, the presence of a quorum was announced.

Election of officers:

On behalf of Mr. Riesinger, Mr. Wrobel then announced the nomination of the following individuals for election as the officers of the corporation:

Thomas Riesinger – President and CEO
Peter Kanzlsperger – Vice-President and COO
Sylvia Weber – Treasurer, Secretary, and CFO

Mr. Wrobel called for a vote on the proposed officers and the slate nominated was elected upon the unanimous vote of all the directors present at the meeting

Election of Chairman of the board:

After the election of the officers, Mr. Wrobel confirmed that the directors wished to elect a chairman of the board. Mr. Wrobel confirmed that the chairman would be responsible for calling any subsequent director meetings and for presiding over those meetings. Thomas Riesinger was nominated for the position of chairman and was elected by the unanimous vote of all the directors present at the meeting.

Schedule of regular directors' meetings:

Following the election of a chairman, the board then considered what schedule would be appropriate for subsequent regular meetings of the board of directors. After a short discussion among the directors, it was resolved by unanimous consent that regular meetings of the board would take place at least every 6 months. The chairman would be responsible for selecting the date, time, and location of each meeting.

The Directors decided to conduct a minimum of 2 and maximum of 4 mandatory meetings per year. Meetings above 4 are at the discretion of the individual member and additional compensation may be given.

In addition, a short discussion also followed regarding whether non-directors could be present at the directors' meetings. It was agreed that so long as a majority of the directors present at the meeting consented to the individual's presence, the presence of the non-director was permissible.

2

Business Discussions:

At this time, Mr. Riesinger opened the floor for a general discussion of business matters. Mr. Wrobel and Ms. Ciccarello excused themselves from attending this portion of the meeting and the discussions ensued. The following matters were addressed and decided during these discussions:

Agenda for Business Discussions:

1. Financials: Discussion and Approval of the years 1999,2000,2001
2. Shareholder Information Standards and Procedures
3. Future Strategic Directions and Development
4. Compensation of the Members of the Board

### 1. **Financial reports**

Mr. Bernd Stern was asked by the chairman of the board to present the Financials of the years 1999, 2000 and 2001 for discussion and approval.

|  | 1999 | 2000 | 2001 |
|---|---|---|---|
| Total Liabilities and Stockholders' Equity | $42.957,27 | $1.330.744,25 | $520.986,64 |
| Net Loss | $137.782,80 | $1.064.725,21 | $974.340,50 |

Discussions about 1999 Financials:
- The administrative expenses can be divided into
  $68,000 Legal Advisor
  $57,000 Consulting Services
  $12,000 Travel and General Administrative Expenses

Discussions about 2000 Financials:
- Sales come from Licensing Fees
- Other Income: Internal Administrative charges, currency exchange gains and other operational income
- Assets reflect the company's bank account balance at year-end and miscellaneous receivables

Question H-GB: Consolidation requirement for NAWA USA, Inc and NAWA Heilmittel and NAWA Vertriebs GmbH
Answer BS and SW: Not legally required and not feasible at this time. Better to not consolidate as long as there is no tax advantage resulting out of the consolidation.

Question TR: Can the shareholders realize the losses?
Answer BS: In an US Inc. the losses remain within the corporation and can be used for future tax purposes in the company, so the shareholder cannot realize the losses.
SW offered to attain more information from tax advisor to clarify the matter.

Investment in equity reflects the purchase of 80% each of the two firms NAWA Heilmittel and NAWA Vertriebs GmbH. The 80% stakes in both companies

3

have been purchased at par value. In addition, a dormant partnership at NAWA Heilmittel GmbH was resolved.

BS stated that the future price for the remaining 20% stakes in NAWA Heilmittel and NAWA Vertriebs GmbH have to be evaluated differently.

Liabilities:

Accounts payable to Legal Advisors, NDS New Drug Services (regulatory affairs) and other creditors

Other accrued liabilities: among other things compensation of "dormant partner"

Discussion of 2001 Financials:

- Income Statement: Sales have increased by approx. 300% in comparison to 2000, discussion of operating expenses

TR states: the company's investor acquisition strategy changed during 2001. The focus was placed on institutional investors.

Stockholder equity was negative in 2001, however this was accepted due to the fact that negotiations with a major investor were finalized in December 2001. The funds have been transferred in January 2002 and will be reflected in the next financial report.

The officers TR and SW provided the company with shareholder/director loans to improve the company's liquidity situation in 2001.

Capital Stock includes an employment option plan for 2 long-term employees of Nawa Vertriebs GmbH. This option plan should have the purpose of serving as an incentive that can be achieved in the course of 5 years of working with the company of 10,000 options per year.

**Decision:**

**Approval of the financials 1999, 2000 and 2001 by the board. 2001 financials have been approved with the allowance for minor revisions.**

2.  **Shareholder information standards and procedures**

The board discussed what informational reporting procedures concerning the business and activities of the company the corporation should implement for distribution to its shareholders.

NAWA USA, Inc. at its current non-public status is not legally required to provide information to the shareholders.

H-GB: good information policies avoid speculations by the shareholders and should be implemented. Especially the informations in the Profit and Loss-Statement should for that reason be relatively detailed.

4

**Decision:**
**Shareholders will receive financial information once a year with explanations. A semi-annual status report will replace the quarterly NAWA USA, Inc. Newsletter.**

### 3. Discussions of future strategies

Dr. Gaiger presented a preliminary outline of proposed achievement milestones to be pursued by the company in both the United States and Europe. Dr. Gaiger informed the directors that a written summary of his comments would be provided via email to the directors at a future date.

Mr. Riesinger was instructed to develop a prototype/research sample of the dressing, with a target date for completion of the sample of March 11, 2002.

**Decision:**
**The Board decided to focus on the development of a NAWA wound healing dressing called "solid component" of the NAWA Wound Healing system (WHS). The NAWA WHS consists of 2 parts:**
    i.    **Solid Component: Wound dressing**
    ii.    **Liquid Component: NAWA Solution**
**The company will focus on attaining medical device status in the US and expanding the existing CE- Certification within Europe.**
**TR will develop a Prototype Zero-Series of the solid component until March 11th, 2002.**

### 4. Compensation for directors

After the issue of director compensation was raised, the directors stated that some level of director compensation might be appropriate for board members actively involved in formulating strategy and development for the company. The directors agreed that any reasonable expenses attributable to actions as a board member should be reimbursed by the company, but the directors resolved to suspend further discussions regarding any additional compensation until the next board meeting.

Monetary compensation:
    i.  *Active board members*, i.e. actively involved in the development of NAWA's Strategy & Development will receive an annual compensation of $8,000 paid as quarterly installments.
    ii.  *Non-active board members* will receive an annual compensation of $2000 paid in quarterly installments.

**Decision:**
**$8,000 paid in quarterly installments to active board members**

In addition, the directors decided that a proposed stock option plan would be drafted by Sylvia Weber, as secretary of the company, and distributed to board members for discussion at the next board meeting.

**Decision:**
**Option Plan will be developed and discussed at the next meeting**


5.  Officers' and directors' liability insurance

After a discussion of this topic, Sylvia Weber, as secretary of the company, was authorized to solicit information regarding officers' and directors' insurance coverage and was instructed to distribute this information when available, with a target date of March 6, 2002. It was agreed that the insurance information obtained would be discussed at the next directors' meeting, or, by a unanimous written consent of the board adopted prior to that date, the officers could be authorized to place approved insurance coverage.

**Decision:**
**Information about Liability insurance will be provided within two weeks and discussed at the next meeting.**


Adjournment:

Upon the conclusion of these discussions, Mr. Wrobel and Ms. Ciccarello returned to the meeting, which was subsequently adjourned by Mr. Wrobel.


| | |
|---|---|
| Thomas Riesinger –Chairman and CEO | Date |

| | |
|---|---|
| Peter Kanzlsperger – Director and COO | Date |

| | |
|---|---|
| Prof. Dr. Alexander Gaiger – Director | Date |

| | |
|---|---|
| Dr. Hans-Georg Bottler – Director | Date |

| | |
|---|---|
| Bernd Stern – Director | Date |

6

# EXHIBIT G

03/08 03  MO  18:11 FAX                                                          ☒001

## LICENSE AND CO-DEVELOPMENT AGREEMENT

This License and Co-Development Agreement (the "Agreement") is entered into this 23rd day of June, 2003 (the "Effective Date"), by and between NAWA USA, Inc., a corporation organized under the laws of the State of Delaware, having a place of business at 1825 Eye Street, N.W., Suite 400, Washington, D.C.  20006 (hereinafter referred to as "Licensor") and Health Pathways, Inc., a corporation organized under the laws of the State of Delaware, having a place of business at 101 Orchard Ridge Drive, Suite 1N, Gaithersburg, Maryland 20878 (hereinafter referred to as "Licensee").

## RECITALS

WHEREAS, NAWA Heilmittel GmbH is the owner, and Licensor is the exclusive Licensee, of certain know-how and certain inventions, improvements and discoveries disclosed in various patent applications and patents;

WHEREAS, Licensee has the know-how to develop and commercialize pharmaceutical compounds in appropriate markets, and has the financial ability to do so;

WHEREAS, Licensee is desirous of obtaining an exclusive license to make, have made, use, sell, and offer for sale NAWA Heilmittel GmbH's know-how and the apparatuses and methods disclosed in its patent applications and patents, together with the right to sublicense the same, for certain indications and fields and territories; and,

WHEREAS, Licensor is willing to grant such an exclusive license, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, for and in consideration of the rights, obligations, mutual promises and covenants of the parties set forth in this Agreement and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto respectively intending to be legally bound, have agreed and do hereby agree as follows:

1.    **DEFINITIONS.**

For purposes of this Agreement, the following terms shall have the meanings set forth as follows:

1.1    "Affiliate" shall mean and refer to any business, company, partnership, or joint venture more than fifty percent (50%) of the interest in which is owned or controlled (i) by a party or (ii) by any parent or subsidiary of a party.

1.2    "Compound" shall mean and refer to any compound protected by the Licensed Patents and any derivative salts and formulations thereof.

#194084v2

1.3    "Confidential Information" shall mean and refer to: (i) any and all information in any form (oral, written, electronic, or otherwise) belonging to, or related to the business of, a disclosing party or any third party with whom the disclosing party has a business relationship, including Trade Secrets (as defined below), which is of tangible or intangible value to the disclosing party or third party and which is not public information or is not generally known or available to their present or potential competitors but is known only to them and to those of their employees, independent contractors, agents, representatives, advisors, or others to whom such information may be confided in for business purposes; and, (ii) all notes, memoranda, reports, documents, software, and/or materials, in whole or in part, of whatever kind or nature prepared, collected or stored by, or on behalf of, the receiving party to the extent that the materials refer to, include, incorporate, or are derived from other information identified in clause (i) of this Section 1.3.

1.4    "Field" shall mean and refer to patient treatments for all indications, excluding: (i) veterinary treatments using formulations of the Compound specifically manufactured for veterinarian use; and (ii) patient treatments using formulations of the Compound in liquid form for nutraceutical (i.e. non-pharmaceutical or non-medical device) use in the Territory. If the parties amend this Agreement in the future to include the member countries of the European Union within the Territory, then the Field shall also exclude patient treatments using formulations of the Compound in liquid form for oral consumption in the member countries of the European Union.

1.5    "Improvements" shall mean and refer to any new invention not a part of the Licensed Patents if such new invention requires the practice of any claims of the Licensed Patents, together with any new invention the practice of which is necessary to the commercial practice of the inventions of the Licensed Patents.

1.6    "Intellectual Property" shall mean and refer to (i) copyrights, moral rights, and any other rights to any form or medium of expression, (ii) Trade Secrets, privacy rights, and any other protection for Confidential Information or ideas, (iii) patents and patent applications, (iv) trademarks, service marks, and registration applications therefor, and (v) any inventions, innovations, discoveries, designs, apparatuses, methods, compounds, formulations, items, information, or theories, or any new or useful improvements thereof which are protectable or registrable under any of the copyright, patent, trademark, trade secret, confidentiality or other similar laws.

1.7    "Intellectual Property Rights" shall mean and refer to all rights in the Intellectual Property.

1.8    "Licensed Know-How" shall mean and refer to technical Confidential Information which relates to the Compound, Licensed Patents, or Licensed Products, including, without limitation, all chemical, pharmacological, toxicological, clinical, assay control, and manufacturing data which is used or is useful for the development, manufacture, or marketing of the Licensed Products.

#194088v2

1.9    "Licensed Patents" shall mean and refer to any and all inventions, improvements and discoveries disclosed in the patent applications and patents, or equivalents, identified in Schedule 1 hereof, all patents or equivalents thereof which may be issued on such patent applications, all continuations and divisions thereof, all substitutions therefor, and all reexaminations and reissues of such patents or equivalents thereof.

1.10    "Licensed Products" shall mean and refer to any and all products or processes that employ or are in any way produced by the practice of an invention claimed in the Licensed Patents or that would otherwise constitute an infringement of any claims of the Licensed Patents.

1.11    "Net Sales Price" shall mean and refer to the invoice price for the Licensed Products, f.o.b. manufacturer's factory, after deduction of regular trade and quantity discounts, cash discounts (not to exceed 2% of the invoice price based on cash payment within ten days of receipt of invoice), but before deductions for freight allowances and agents' or sales commissions. Where the Licensed Products are not sold, but are otherwise disposed of, the Net Sales Price of the Licensed Products shall be the selling price at which products of similar kind and quality, sold in similar quantities, are currently being offered for sale by Licensee or an Affiliate or sublicensee thereof. Where such similar products are not being offered for sale by Licensee or an Affiliate or sublicensee thereof, the Net Sales Price of the Licensed Products otherwise disposed of shall be the average selling price at which products of similar kind and quality, sold in similar quantities, are then currently being offered for sale by other manufacturers. In order to assure to Licensor the full royalty payments contemplated in this Agreement, Licensee agrees that in the event any Licensed Product shall be sold for purposes of resale either: (a) to a corporation, firm, or association that, or individual who, owns a controlling interest in Licensee by stock ownership or otherwise, or (b) to a corporation, firm, or association in which Licensee or its stockholders own a controlling interest by stock ownership or otherwise, the royalties to be paid in respect to such Licensed Products shall be computed on the greater of: (I) the Net Sales Price at which the purchaser for resale sells such Licensed Products; and, (ii) the Net Sales Price of Licensee.

1.12    "Territory" shall mean and refer to all countries of the world with the exclusion of those countries which are members of the European Union as of the Effective Date of this Agreement.

1.13    "Trade Secret" shall have the meaning defined under applicable law.

## 2.    GRANT OF RIGHTS.

2.1    License Grant. Subject to the terms and conditions of this Agreement and in consideration of the payments due Licensor pursuant to Article 3 hereof, Licensor hereby grants to Licensee under the Licensed Patents and Licensed Know-How, and Licensee hereby accepts from Licensor, subject to the provisions contained herein, a perpetual, non-transferable, royalty-bearing, exclusive license to make, have made, use, sell, and offer for sale Licensed Products, and to sublicense third parties to do the same (subject to Section 2.2 below), within the Field and

#194086v2

23/06 03 MO 18:12 FAX                                                                    ☒004

**PAGE 4**

within the Territory for the Term set forth herein (the "License"). Licensee acknowledges and agrees that no license is granted or implied under, and agrees not to practice under, the Licensed Patents and Licensed Know-How outside the Field and Territory.

     2.2    <u>Right to Sublicense</u>. Licensee shall have the right to grant sublicenses under the Licensed Patents and Licensed Know-How to third parties, at payments cumulatively no less, or a royalty rate not less, than that required to be paid under Section 3.2 of this Agreement and with the prior written consent of Licensor, which consent shall not be unreasonably withheld. In the event that the License granted hereunder is terminated pursuant to the provisions of this Agreement, all sublicenses granted by Licensee to third parties shall terminate; provided, however, that any sublicensee may elect to continue its sublicense by so advising Licensor in writing, within ninety (90) days of sublicensee's receipt of written notice of such termination, of its election and of its agreement to assume in respect to Licensor, all the obligations (including obligations for payments) contained in its sublicensing agreement with Licensee. All sublicense agreements including sublicenses granted by Licensee shall contain provisions corresponding to those of this paragraph respecting termination and the conditions of continuance of sublicenses. Licensee shall provide Licensor with a copy of each such sublicense agreement within ten (10) days after the execution of the sublicense agreement.

     2.3    <u>Improvements</u>.

     2.3.1    <u>Notice</u>. In the event that either party develops any invention or application after the Effective Date of this Agreement which (a) relates to the Compound, Licensed Patents, or Licensed Know-How, (b) arises out of, results from, or is based on the Compound, Licensed Patents, or Licensed Know-How, and (c) constitutes an Improvement of the invention(s) of the Licensed Patents or Licensed Know-How, the developing party shall promptly notify the non-developing party of such Improvement by providing the non-developing with a complete and thorough written disclosure of such Improvement. All such disclosures shall be considered as Confidential Information and shall be subject to all provisions of this Agreement relating to the treatment of Confidential Information.

     2.3.2    <u>License(s) to Improvements</u>. In the event that either party develops an Improvement as described in Section 2.3.1 above, the developing party shall own all rights in and to such Improvement, including all Intellectual Property Rights therein, and the developing party hereby grants, and the non-developing party hereby accepts, subject to the provisions contained herein, a non-transferable, royalty-free, paid-up, perpetual, non-exclusive license to use such Improvement (an "Improvement License"). In the event Licensor is the non-developing party, the scope of the Improvement License shall extend to all fields on a worldwide basis for the Term set forth herein. In the event Licensee is the non-developing party, the scope of the Improvement License shall be limited to uses within the Field and within the Territory for the Term set forth herein. The non-developing party shall have a first right of refusal with respect to manufacturing and marketing such Improvement and shall have a period of ninety (90) days after receiving notification of such Improvement pursuant to Section 2.3.1 above in which to reach an agreement with the developing party with respect to the manufacturing and sales thereof. The parties shall negotiate such agreement in good faith and in a timely manner. If the parties do not reach such agreement within such ninety (90) day period, the first right of refusal shall

23/06 03 MO 18:13 FAX

automatically expire (unless extended in writing by the mutual agreement of the parties) and the developing party shall have the right to manufacture and market such Improvement.

3.    **CONSIDERATION**.

3.1    <u>License Fee</u>.   Licensee shall pay to Licensor a license fee in the amount of US$200,000 (the "License Fee"), with the initial amount of US$77,000 payable on or before Tuesday, July 22, 2003 and the remaining amount of US$123,000 payable in equal monthly installment payments of $11,181.82 over the eleven (11) month period starting in August, 2003 and extending until July, 2004.  The first such monthly installment payment shall be due and received by Licensor no later than August 1, 2003, with succeeding monthly installment payments being due and received by Licensor no later than the first day of each month in which payment is due.

3.2    <u>Royalties</u>.

3.2.1    <u>Royalty Payment Amounts</u>.   In addition to the License Fee paid by Licensee to Licensor pursuant to Section 3.1 of this Agreement, Licensee shall pay to Licensor a royalty of seven percent (7%) of the Net Sales Price of all Licensed Products sold or otherwise disposed of under the License granted under Section 2.1 of this Agreement.  In the event that Licensee grants sublicenses to third parties pursuant to Section 2.2 of this Agreement, Licensee shall pay to Licensor royalty fees in the following amounts:  (a) thirty-five percent (35%) of all consideration payable to Licensee by such third parties in connection with the sublicensing of rights in the Territory; and, (b) if the parties amend this Agreement in the future to include the member countries of the European Union within the Territory, (i) thirty-five percent (35%) of all consideration payable to Licensee by such third parties in connection with the sublicensing of rights in the non-member countries of the European Union, and (ii) fifty percent (50%) of all consideration payable to Licensee by such third parties in connection with the sublicensing of rights in the member countries of the European Union.  All royalties shall be paid in U.S. dollars to Licensor at the address provided in Section 21.16 below.

3.2.2    <u>Royalty Payment Dates/Reports</u>.  Licensee shall promptly inform Licensor of the date on which the commercial production of each Licensed Product begins.  Once such commercial production begins, Licensee shall:  (a) pay royalty payments due Licensor under Section 3.2.1 on a quarterly basis with such payments being made by Licensee and received by Licensor on or before the last day of January, April, July and October, following the calendar quarter for which payments are due based on Licensee's billed invoices (provided that if Licensee makes diligent efforts to collect billed invoices, and despite such diligent efforts is unable to collect any such invoices within one-hundred twenty (120) days after customer's receipt of invoice, then the royalties payable on such uncollected amount may be deducted from the royalty payment next due, further provided that such uncollected amount shall in no event exceed 5% of the billed invoices during the calendar quarter during which the uncollected invoice was originally included, and further provided that in the event that such uncollected amount shall be collected at a later date, the amount collected will then be included in the billed invoices upon which royalties are next due) and, (b) render quarterly statements to Licensor with

such royalty payments, the statements providing the total amount due Licensor and the following information differentiated according to the product line(s) and model identifier(s) of Licensed Products produced or otherwise disposed of by Licensee or third parties pursuant to sublicenses granted by Licensee: (i) the total number of Licensed Products produced; (ii) the total number of Licensed Products sold or otherwise disposed of; (iii) the total number of Licensed Products for which an amount is due Licensor; (iv) the amount due Licensor; and, (v) a description of the method employed to calculate the amount due. All amounts due shall be stated in U.S. dollars. In the event no royalty payment is due Licensor, a statement setting forth that fact shall be supplied to Licensor by the dates identified above.

3.3     Late Payments.  Any amount due Licensor from Licensee, pursuant to Article 3 of this Agreement, that Licensee fails to pay to Licensor in accordance with the procedures set forth in this Agreement shall bear interest at a monthly rate of one and one percent (1.0 %) or at the maximum interest rate permitted under applicable law, whichever is lower.  If any amount due Licensor remains unpaid by Licensee beyond thirty (30) days from the date such amount becomes payable as set forth in this Agreement absent any extension of time for payment in writing between the parties, such failure to pay said amount due constitutes a material breach of this Agreement and, in addition to all other applicable rights and remedies, Licensor may elect, at its sole discretion, to immediately (a) terminate this Agreement in accordance with the termination provisions of Article 20 hereof, or (b) suspend any further performance under this Agreement until Licensee pays all amounts due, together with interest due.

3.4     Taxes and Duties.  Licensee shall pay all sales, use, goods, services, value added, or other similar taxes or duties assessed by local, state, federal, or foreign governments or authorities that are imposed on the amounts due Licensor from Licensee by reason of Licensee's exercise of the rights granted to Licensee under this Agreement.

4.     **MANUFACTURING.**

Licensor shall assign, transfer and convey to Licensee, within thirty (30) days after the Effective Date of this Agreement, all of Licensor's rights and obligations existing under agreement(s) with Licensor's manufacturer(s) for the production of Licensor's products licensed hereunder.  Licensor shall also deliver to Licensee the information present in the specifications provided by Licensor to the manufacturer(s) of such products.  Licensor shall fully and actively cooperate with the manufacturers selected by Licensee, which cooperation shall include personal meetings between Licensor's representatives and such manufacturers' representatives as deemed necessary by Licensee; Licensee shall reimburse Licensor for any expenses incurred as a result of its cooperative efforts under this paragraph 4.

5.     **CO-DEVELOPMENT COMMITTEE.**

Promptly following the Licensor's acceptance of the strategic product development plan referred to in Section 6.1 below, the parties shall form a co-development committee to consider, consult and make decisions on issues relating to the development, approval, and

#194086v2

commercialization of Licensed Products and other issues of import to Licensor and Licensee during the Term of this Agreement. The co-development committee shall include five (5) members, comprising two (2) members from Licensor and three (3) representatives from Licensee. All members of the co-development committee shall be available for a weekly meeting held via a conference call on a day and at a time mutually agreeable to the members. Licensor's members shall make at least two (2) trips per year to the United States to attend meetings of the co-development committee, with the costs and expenses of such trips being promptly reimbursed by Licensee and with Licensor's members promptly receiving mutually agreeable consideration from Licensor for making such trips.

6.     **STRATEGIC PRODUCT DEVELOPMENT PLAN.**

6.1     Plan for Territory. Licensee shall, within forty-five (45) days of the Effective Date of this Agreement, develop and provide to Licensor a strategic product development plan for the Territory covering the development and commercialization of all applications in the Territory, which Licensor shall accept or reject (or accept with mutually agreeable modifications) within thirty (30) days after presentation. Such strategic product development plan shall address, among other items generally addressed by similar plans within the industry, the tasks and/or steps necessary to accomplish such development and commercialization, time tables for accomplishing such tasks and/or steps, and the minimum expenditures related to the commercialization of the applications. Upon acceptance of the strategic product development plan by Licensor, the strategic product development plan shall be incorporated as a part of this Agreement, and any breach of the terms of the strategic product development plan after such acceptance by Licensor shall be deemed a breach of the milestones set forth in Article 7 below.

6.2     Plan for European Union. Licensee shall, after proper assessment of all facts and circumstances, within sixty (60) days of the Effective Date of this Agreement, submit to Licensor a strategic product development plan, including provisions for Licensee to exclusively license the rights to the Licensed Patents and Licensed Know-How in the European Union member countries, which are not presently included in the Territory of the License granted in this Agreement, at a license fee of US$500,000 payable by Licensee to Licensor in monthly installments over the period of one (1) year after acceptance of such plan by Licensor. Licensor shall review and then accept or reject (or accept with mutually agreeable modifications) such plan within thirty (30) days after presentation. Such strategic product development plan shall address, among other items generally addressed by similar plans within the industry, the development and commercialization of all applications in such member countries of the European Union, the tasks and/or steps necessary to accomplish such development and commercialization, and time tables for accomplishing such tasks and/or steps, and the minimum expenditures related to the commercialization of the applications. Upon acceptance of the strategic product development plan by Licensor, the strategic product development plan shall be incorporated as a part of this Agreement, and any breach of the terms of the strategic product development plan after such acceptance by Licensor shall be deemed a breach of the milestones set forth in Article 7 below.

#1940A6v2

25/08 05 MO 18:14 FAX                                                        @008

PAGE 8

7.    **MILESTONES.**

7.1    Licensee Milestones. Licensee shall meet, and shall be solely responsible for meeting, the following milestones during Licensee's performance under this Agreement:

(a)    Licensee shall produce and deliver to Licensor the strategic product development plan for the Territory, as set forth in Section 6.1 above, within forty-five (45) days of the Effective Date of this Agreement, which plan must be considered and accepted or rejected by Licensor (with mutually agreeable modifications if required by Licensor) within thirty (30) days after presentation. After such acceptance, if any, of such plan by Licensor, Licensee shall perform the tasks and/or steps of such plan in accordance with the time table included in such plan;

(b)    Licensee shall produce and deliver to Licensor the strategic product development plan for the European Union member countries not presently included in the Territory, as set forth in Section 6.2 above, within sixty (60) days of the Effective Date of this Agreement, which plan must be considered and accepted or rejected by Licensor (with mutually agreeable modifications if required by Licensor) within thirty (30) days after presentation. After such acceptance, if any, of such plan by Licensor, Licensee shall perform the tasks and/or steps of such plan in accordance with the time table included in such plan;

(c)    Licensee shall produce and deliver to Licensor no later than December 31, 2003, a strategic product development plan related only to the sports applications of the Licensed Patents and Licensed Know-How, with such plan addressing, among other items generally addressed by similar plans within the industry, the development and commercialization of the sports applications, the tasks and/or steps necessary to accomplish such development and commercialization, time tables for accomplishing such tasks and/or steps, and the minimum expenditures related to the commercialization of the applications, which plan must be considered and accepted or rejected by Licensor (with mutually agreeable modifications if required by Licensor) within thirty (30) days after presentation. After such acceptance, if any, of such plan by Licensor, Licensee shall perform the tasks and/or steps of such plan in accordance with the time table included in such plan;

(d)    Licensee shall produce and deliver to Licensor a clinical Phase I plan for the first wound healing indication no later than March 31, 2004, with such plan addressing, among other items generally addressed by similar plans within the industry, the tasks and/or steps necessary to accomplish such clinical Phase I, time tables for accomplishing such tasks and/or steps, and the minimum expenditures related to the commercialization of the applications, which plan must be considered and accepted or rejected by Licensor (with mutually agreeable modifications if required by Licensor) within thirty (30) days after presentation. After such acceptance, if any, of such plan by Licensor, Licensee shall perform the tasks and/or steps of such plan in accordance with the time table included in such plan;

(e)    Licensee shall produce and deliver to Licensor a clinical Phase I plan for the second wound healing indication no later than August 31, 2004, with such plan addressing, among other items generally addressed by similar plans within the industry, the tasks and/or

#1940A6\2



23/06 03  MO  18:15 FAX                                                                    ⊠008

steps necessary to accomplish such clinical Phase I and time tables for accomplishing such tasks and/or steps, and the minimum expenditures related to the commercialization of the applications, which plan must be considered and accepted or rejected by Licensor (with mutually agreeable modifications if required by Licensor) within thirty (30) days after presentation. After such acceptance, if any, of such plan by Licensor, Licensee shall perform the tasks and/or steps of such plan in accordance with the time table included in such plan; and,

(f) Licensee shall produce and deliver to Licensor clinical Phase I plans for each of the other three wound healing indications within ten (10) years after the Effective Date of this Agreement, with such plans addressing, among other items generally addressed by similar plans within the industry, the tasks and/or steps necessary to accomplish the clinical Phase I for such indications, time tables for accomplishing such tasks and/or steps, and the minimum expenditures related to the commercialization of the applications, which plan must be considered and accepted or rejected by Licensor with mutually agreeable modifications if required by Licensor) within thirty (30) days after presentation. After such acceptance, if any, of such plans by Licensor, Licensee shall perform the tasks and/or steps of such plans in accordance with the time tables included in such plans.

7.2     Failure to Meet Milestones.  In the event that Licensee fails to meet any of the milestones of this Article 7 (including, but not limited to, the delivery of a plan or other deliverable to Licensor which is unacceptable to Licensor), the License granted by Licensor to Licensee pursuant to Article 2 of this Agreement shall immediately terminate and all rights associated therewith shall revert back to Licensor.  Upon the occurrence of such event, Licensor shall pay to Licensee the amount of Licensee's documented expenses as determined at such time, according to then current industry standards, by a representative of Deloitte & Touche (McLean, Virginia office) or its successor (or by such other representative mutually agreeable to the parties), which representative shall have appropriate knowledge and experience in the healthcare industry. Such amount shall cover one hundred percent (100%) of Licensee's hard costs and fifty percent (50%) of Licensee's soft costs incurred pursuant to this Agreement through the date on which Licensor terminates the license hereunder.

8.     **DISCLOSURE OF INFORMATION.**

Each party acknowledges and agrees that disclosure, to the other party, of information relevant to the business objectives contemplated by this Agreement is essential to meeting such objectives.  Therefore, each party agrees to disclose such relevant information to the other party, including, without limitation, Intellectual Property and information related to the Compound and indications covered by this Agreement, and that such Intellectual Property and information shall be considered Confidential Information subject to the provisions of this Agreement pertaining to Confidential Information.  In furtherance of the foregoing, Licensor shall promptly deliver to Licensee after execution of this Agreement, hard copies of (a) the regulatory and pre-clinical and clinical data related to the Compound and the present indications thereof, and (b) the Licensed Patents and patent applications thereof.  Upon termination of this Agreement, Licensor shall destroy or return such hard copies in accordance with Article 11 of this Agreement.

#1940664v2

## 9.    RECORDS.

9.1    Record Keeping.  Licensee shall keep complete books, records, and accounts of all amounts which may become refundable to Licensee in accordance with Section 7.2 above, and all production and sales of Licensed Products upon which a royalty or other payment may be due Licensor during the period this Agreement remains in force.  Such books, records, and accounts shall be preserved for a period of not less than six (6) years after their creation during and after the period that this Agreement is in force.

9.2    Inspection.  During the period that this Agreement is in force and for a period of two (2) years thereafter, Licensor shall have the right, through a duly accredited representative(s) selected by Licensor and at its own cost, to inspect, examine and copy the records and accounts of Licensee pertaining to the Licensed Products and royalty payments insofar as may be necessary to verify the quarterly statements provided for herein.  In the event that Licensor desires to exercise such right, Licensor shall notify Licensee by written notice at least ten (10) days in advance of the date of such inspection.  All inspections made pursuant to this Section 9.2 shall be made during reasonable business hours.  In the event that a royalty payment deficiency is identified, Licensee shall pay the outstanding royalty deficiency to Licensor within thirty (30) days of receiving written notice thereof from Licensor, plus interest on the outstanding amount pursuant to Section 3.3 hereof.  In the event that a royalty payment deficiency for any quarter exceeds two percent (2%) of the royalty amount actually due Licensor for that quarter, Licensee shall promptly reimburse Licensor for Licensor's inspection costs and expenses in addition to the deficiency and interest thereon.  Licensor agrees that the information present in the records and accounts of Licensee pertaining to the Licensed Products and royalty payments, and all copies thereof, include Confidential Information of Licensee and Licensor agrees to maintain the confidentiality of such information, and copies thereof, in accordance with the provisions of this Agreement related to the treatment of Confidential Information.  Licensor shall use such information for no purpose other than to verify the accuracy of Licensee's quarterly statements, to determine whether Licensee is in compliance with this Agreement, and to enforce Licensor's rights hereunder.

## 10.    PATENTS.

10.1    Patent Prosecution.  Licensor shall retain the right to file and control the prosecution of all patent applications of the Licensed Patents at Licensor's sole expense.  Licensor shall be responsible for timely continuing the patent applications identified as items 4 and 5 on Schedule 1 in the United States, Canada, Japan, China, South Korea and Taiwan, at its sole expense, provided that Licensee shall be responsible for timely paying the fees incident to maintaining such patent protections in China, South Korea and Taiwan subsequent to July 12, 2003.  In the event that either party develops an Improvement as set forth in Section 2.3, the developing party shall have the right to file and control the prosecution of all patent applications therefor at the developing party's sole expense.

10.2    Patent Enforcement.

#194086/v2

10.2.1 <u>Notification of Infringement</u>.  In the event that either party to this Agreement believes that there is infringement of any Licensed Patent in the Field and Territory, the party believing the existence of such infringement shall provide the other party with notification and reasonable evidence of such infringement.  Each party shall notify the other party of all actions taken, as permitted hereunder, to cause cessation or elimination of such infringement.

10.2.2 <u>Enforcement by Licensor</u>.  Licensor intends to protect the Licensed Patents against infringers or otherwise act to eliminate infringement when, in Licensor's sole judgment, such action may be reasonably necessary, proper, and justified.  Licensor shall have the right to initiate and control suits for infringement of the Licensed Patents and settlements thereof, subject to Licensee's rights set forth below in Section 10.2.3.  In the event that Licensor enters into a suit against an infringer with respect to an infringement of any of the Licensed Patents in the Field and Territory, Licensee shall have the right, at its sole discretion and expense, to join such suit as a coplaintiff.

10.2.3 <u>Enforcement by Licensee</u>.  Unless otherwise agreed by the parties, in the event that Licensor fails within one hundred eighty (180) days from the date of notification by Licensee of an infringement of any of the Licensed Patents in the Field and Territory to (a) secure cessation of such infringement, (b) enter suit against the infringer, or (c) enter into an arrangement suitable to Licensee with respect to such infringement, Licensee shall have the right, at its sole discretion and expense, to bring suit in Licensee's name, or if required by law, jointly with Licensor for infringement of the appropriate Licensed Patent(s), and have the right to control such suit and the settlement thereof.  Licensor shall have the right, at its sole discretion and expense, to join such suit as a coplaintiff if Licensor is not otherwise required by law to be joined in such suit.

10.2.4 <u>Cooperation by Parties</u>.  In the event that a party to this Agreement attempts to secure cessation of an infringement of any of the Licensed Patents in the Field and Territory or brings suit for such infringement, the other party agrees to provide reasonable cooperation in a timely manner, at the other party's cost and expense, to assist the party in such efforts.  Each party further agrees that no settlement of such an infringement suit shall be entered into by either party without the consent of the other party, which consent shall not be unreasonably withheld.

10.3    <u>Patent Maintenance Fees</u>.  Licensor shall make timely payment of all maintenance and/or annuity fees, surcharge fees, and other similar fees appropriate and necessary to maintain the enforceability of the Licensed Patents for the Territory areas while this Agreement is in force.

10.4    <u>Patent Marking</u>.  Licensee agrees to mark, or cause the marking of, all Licensed Products with markings in accordance with legends provided to Licensee by Licensor from time to time, or in the absence of such provided legends, in accordance with applicable law(s) appropriate for issued patents and pending patent applications in the respective countries in which the Licensed Products are used or sold.  In the event that it is not practical to mark the Licensed Products, then such markings shall be made to the containers or packaging in which the Licensed Products are sold or otherwise provided.  Licensee shall require all Affiliates and

#194086v2

sublicensees of Licensee, if any, to so mark any products produced in connection with or as a result of this Agreement.

     10.5   Patent Validity. Licensee agrees that it will not contest, and that it will require its Affiliates and sublicensees, if any, to not contest, the validity of any of the Licensed Patents. In the event that a third party contests the validity of any of the Licensed Patents, Licensee shall continue to make all payments due Licensor with respect to the Licensed Patents as if such contest were not underway.

## 11.   CONFIDENTIALITY.

     11.1.   Non-Disclosure. As a condition of a party (a "Receiving Party") being furnished or being given access to or the ability to learn Confidential Information of the other party (a "Disclosing Party") (whether such information is prepared or disclosed by the Disclosing Party, its agents, advisors, representatives, or otherwise), and in recognition of the Disclosing Party's need to protect its legitimate business interests, the Licensor and Licensee agree as follows:

        (a)  That for a period of five (5) years from the date of receipt of the Disclosing Party's Confidential Information which will be exchanged relative to this Agreement, and with regard to the Disclosing Party's Confidential Information which constitutes a Trade Secret, for a period as long as such Confidential Information remains a Trade Secret, the Receiving Party shall take reasonable steps to preserve in confidence such Confidential Information and prevent disclosure thereof to third parties (except as expressly permitted herein), and in furtherance thereof, shall treat such Confidential Information in accordance with the terms and conditions of this Agreement.

        (b)  The Receiving Party shall immediately notify the Disclosing Party of any intended, or unintended, unauthorized disclosure or use of any of the Disclosing Party's Confidential Information of which the Receiving Party becomes aware. The Receiving Party shall cooperate fully with and reasonably assist the Disclosing Party in the procurement, maintenance, and enforcement of any protection of the Disclosing Party's rights to or in any of the Confidential Information.

        (c)  The Receiving Party shall use the Disclosing Party's Confidential Information solely in connection with (i) the business relationship between Licensor and Licensee and (ii) the development, approval, and marketing of Licensed Products based on, utilizing, or related to the Licensed Patents and Licensed Know-How (the "Allowed Purpose"), and for no other purposes. The Receiving Party may share the Disclosing Party's Confidential Information, for the Allowed Purpose, only with its directors, officers, representatives, advisors, employees, and sublicensees who have a need to know such Confidential Information in order to carry out their respective functions in connection with the Allowed Purpose, provided that the Receiving Party shall inform such persons or entities of the confidential nature of such information and the terms hereof, and shall direct such persons or entities, and such persons and entities shall agree (i) to abide and be bound by obligations of confidentiality with respect to such information that are no less stringent than those present herein, (ii) to treat such information confidentially, and (ii) to

#194086v2

not show or disclose any part of such information to any third party, except as expressly permitted herein; provided further that no disclosure or provision of the Disclosing Party's Confidential Information shall be made without original restrictive legends and such other markings as may be reasonably required by the Disclosing Party to preserve its confidential nature. The Receiving Party shall take reasonably diligent means, which in any event shall be no less than the level of care or effort the Receiving Party uses to protect its own confidential information and no less than reasonable care, to safeguard the Disclosing Party's Confidential Information.

(d)    In the event that any reproduction of the Disclosing Party's Confidential Information, or any part thereof, is made by or on behalf of the Receiving Party, the Receiving Party shall ensure that any such reproduction includes all of the Disclosing Party's restrictive legends, if any, which are present on the original Confidential Information.

(e)    The Receiving Party shall control access to the Disclosing Party's Confidential Information under and in accordance with all applicable laws and regulations, including, without limitation, all laws and regulations pertaining to export, security, and privacy.

11.2.    Required Disclosures.  In the event that the Receiving Party receives a request to disclose all or any part of the Disclosing Party's Confidential Information under the terms of a subpoena, civil investigative demand or similar process, or order issued by a court of competent jurisdiction or by a governmental body, the Receiving Party agrees to (i) promptly notify the Disclosing Party of the existence and terms of the request, so that the Disclosing Party may seek an appropriate protective order and/or waive compliance with the provisions of this Agreement, and (ii) if disclosure of such information is legally required in the opinion of counsel to the Receiving Party, the Receiving Party and its representatives shall be permitted to make such disclosure without any liability hereunder only after the Receiving Party and its representatives have exercised reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such disclosed information.

11.3.    Return of Confidential Information.  Upon expiration or earlier termination of this Agreement or upon the written request of a Disclosing Party, the Receiving Party shall promptly deliver to the Disclosing Party or, where such delivery is not practical, irrevocably destroy, all Confidential Information provided to the Receiving Party or in the possession or control of the Receiving Party, its employees, representatives, agents, directors, officers, and sublicensees including without limitation any copies, extracts or other reproductions, in whole or in part, of any such Confidential Information and any notes or other materials prepared by the Receiving Party, or on behalf of the Receiving Party, pertaining thereto.  The Receiving Party shall promptly certify its compliance with this provision to the Disclosing Party.

11.4.    Term of Protection.  The provisions of this Agreement which pertain to Confidential Information shall continue in effect for a period of five (5) years from the expiration or earlier termination of this Agreement; provided, however, that any provisions pertaining to Confidential Information which constitutes a Trade Secret shall continue in effect for as long as such Confidential Information remains a Trade Secret.

#194086v2

## 12.    INTELLECTUAL PROPERTY.

12.1    Licensor Intellectual Property.  Licensor and Licensee acknowledge and agree that NAWA Heilmittel GmbH owns (as between NAWA Heilmittel GmbH and Licensee) and will retain all ownership, rights, and interests, now and in the future, in the Licensed Patents, in the inventions and improvements protected by the Licensed Patents, and in all other property rights and interests associated therewith, subject to the License granted to Licensee in this Agreement.  Licensee shall not at any time attack the title, validity, or any of Licensor's rights in and to the Licensed Patents, in the inventions or improvements protected by the Licensed Patents, and all other property rights and interests associated therewith.   Nothing in this Agreement shall be construed as conveying or transferring ownership or title to any Licensor Intellectual Property or other items.

12.2    Licensor Intellectual Property.  Licensor and Licensee acknowledge and agree that (as between Licensor and Licensee), to the extent that Licensee invents, develops, creates, or reduces to practice any Improvements of the technology of the Licensed Patents, Licensee shall own all ownership, rights, and interests in and to such Improvements of the technology of the Licensed Patents, subject to the rights granted to Licensor pursuant to Section 2.3 hereof.  Nothing in this Agreement shall be construed as conveying or transferring ownership or title to any Licensee Intellectual Property or other items.

## 13.    ADDITIONAL COVENANTS.

13.1    Non-Competition by Licensee.    Licensee acknowledges and agrees that Licensor's Compound and related products have become known to the general public and to various medical product developers, manufacturers and marketers, and that Licensor's reputation and goodwill, associated with Licensor's Compound and products, are an integral part of the successful development, marketing and sale thereof.  If, while this Agreement is in force or after the termination of this Agreement, Licensee deprives Licensor of any of such goodwill or in any manner utilizes such goodwill in competition with Licensor, Licensor will be deprived of the benefits it has bargained for pursuant to this Agreement.  Accordingly, as a covenant ancillary to this Agreement, and as an inducement for Licensor to enter into this Agreement, Licensee agrees that while this Agreement is in force and for a period of three (3) years after any termination of this Agreement (the "Non-Competition Period"), Licensee shall not, and shall ensure that all Licensee Affiliates and sublicensees do not, without Licensor's prior written consent, directly or indirectly, anywhere in the "Licensee Non-Compete Territory" (as defined below), develop, produce, sell, license, import, or assist any third party in the development, production, sale, licensing, or importation of any compound, technology, or product having a similar mechanism of action as Licensor's Compound which competes with Licensor's Compound, technology or products; provided, however, that in the event Licensor materially breaches this Agreement and does not cure such breach as set forth herein, such covenant of non-competition shall be null and void and of no force and effect.  For purposes of this Agreement, the "Licensee Non-Compete Territory" shall include the member countries of the European Union as of the Effective Date of this Agreement.

#194086v2

13.2   Non-Competition by Licensor. Licensor acknowledges and agrees that Licensee's products have become known to the general public and to various medical product developers, manufacturers and marketers, and that Licensee's reputation and goodwill, associated with Licensee's products, are an integral part of the successful development, marketing and sale thereof. If, while this Agreement is in force or after the termination of this Agreement, Licensor deprives Licensee of any of such goodwill or in any manner utilizes such goodwill in competition with Licensee, Licensee will be deprived of the benefits it has bargained for pursuant to this Agreement. Accordingly, as a covenant ancillary to this Agreement, and as an inducement for Licensee to enter into this Agreement, Licensor agrees that while this Agreement is in force and during the Non-Competition Period, Licensor shall not, and shall ensure that all Licensor Affiliates and sublicensees do not, without Licensee's prior written consent, directly or indirectly, anywhere in the "Licensor Non-Compete Territory" (as defined below), develop, produce, sell, license, import, or assist any third party in the development, production, sale, licensing, or importation of any product having a similar mechanism of action as Licensee's products which competes with Licensee's products; provided, however, that in the event Licensee materially breaches this Agreement and does not cure such breach as set forth herein, such covenant of non-competition shall be null and void and of no force and effect. For purposes of this Agreement, the "Licensor Non-Compete Territory" shall include all countries of the world with the exclusion of those countries which are members of the European Union as of the Effective Date of this Agreement.

13.3   Goodwill. During the Non-Competition Period, the parties shall not, and shall ensure that their Affiliates and sublicensees, if any, shall not, make any statement or other communication that impugns or attacks the reputation or character of the other party, or that damages the goodwill of the other party; take any action in bad faith that would interfere with any contractual, customer or supplier relationships of the other party, including, without limitation, any action in bad faith that would result in a diminution of business; or otherwise take any action in bad faith that is detrimental to the best interests of the other party; provided, however, that nothing in this Section 13.3 shall prevent a party, or its Affiliates or sublicensees, from conducting competitive business in good faith with a customer or supplier of the other party, even if the conduct of such business may result in the loss of business or revenues to the other party.

13.4   Further Acknowledgements. Each party acknowledges and agrees that a breach of any covenant contained in this Article 13 would cause irreparable damage to the other party, the exact amount of which would be difficult to ascertain, and that the remedies at law for any such breach would be inadequate. Accordingly, if a party breaches any covenant contained in this Article 13, in addition to any other remedy that may be available at law or in equity, the other party shall be entitled to specific performance and injunctive relief. Each party has attempted to limit the rights of the other party, and its Affiliates and sublicensees, to compete only to the extent necessary to protect the limiting party from unfair competition. The parties expressly agree that, if the scope of enforceability of the restrictive covenants of Article 13 are in any way disputed at any time, a court or other trier of fact may modify and enforce such covenants to the extent that it believes to be reasonable under the circumstances existing at the time.

#1940886v2

23/06 03  MO  18:18 FAX                                                   ⌐018

## 14.    BRAND NAMES/USE OF NAMES.

14.1    Brand Names.    Licensee shall have the right, at its sole discretion and sole expense, to select, use, and file registrations for brand names or trademarks for use with the Licensed Products.

14.2    Use of Names.    Subject to approval as described herein, each party shall have the right to use the other party's name in connection with sales promotion, advertising, or other forms of publicity in connection with the indications covered by this Agreement and/or in connection with the Licensed Products in the Field and Territory; provided, however, that neither party and none of its Affiliates or sublicensees shall use the other party's name in connection with indications not covered by this Agreement, products other than the Licensed Products, or for other uses not expressly permitted herein.  In the event that a party desires to use the other party's name as permitted by this Section 14.2, the party shall provide the other party with copies of all labels, advertising, articles, press releases, or other materials which include the other party's name sufficiently in advance of the distribution thereof so as to provide the other party with adequate time to consider the manner in which its name is to be used in such copies.  Upon receipt of such copies, the other party shall promptly inspect, review and consider such copies for approval, which shall not be unreasonably withheld.  If the other party does not approve of the manner in which its name is to be used in such copies, the parties shall work together to develop a mutually acceptable alternative.

## 15.    GOVERNMENT INTERESTS.

The parties acknowledge and agree that if a government (through any of its agencies or otherwise) has funded research, during the course of or under which any of the inventions of the Licensed Patents or Improvements were conceived or made, such government shall be entitled to a license in accordance with appropriate law or applicable regulations to practice or have practiced the inventions of such Licensed Patents or Improvements for that government's governmental purposes.  The licenses granted pursuant to this Agreement shall be subject to such government license.

## 16.    INDEMNIFICATION/INSURANCE.

16.1    Indemnification By Licensee.    Licensee shall indemnify, defend, and hold harmless Licensor and its officers, directors, shareholders, employees, representatives, agents, and Affiliates from all claims, demands, liabilities, losses, damages, judgments or settlements, including all reasonable costs and expenses related thereto including attorney's fees and court costs, directly or indirectly resulting from: (a) personal injury, death, or property damage in connection with the products, processes, or services of Licensee or of any Affiliate or sublicensee of Licensee; (b) any claimed infringement or violation of any patent, trademark, copyright, trade secret, or other Intellectual Property Right with respect to the products, processes, or services of Licensee or of any Affiliate or sublicensee of Licensee; (c) any other claim, proceeding, demand, expense, and liability of any kind whatsoever resulting from the use,

#194086v2



23/06 03  MO  18:19 FAX                                                                          ☒017

manufacture, sale, lease, consumption, or advertisement of Licensed Products arising from any right or obligation of Licensee hereunder; (d) any material breach by Licensee of the terms, conditions, or provisions of this Agreement; or, (e) the untruth of any representation or warranty made by Licensee in this Agreement.

Notwithstanding the foregoing, the Licensee shall not so indemnify such parties as a result of any claimed infringement of a patent of a third party in the Territory with respect to products of Licensee sold in the Territory, provided that such products are manufactured (i) in strict accordance with the disclosures of the Licensed Patents and the Licensed Know-How supplied to Licensee in writing by Licensor; and, (ii) as required in writing by Licensor. The exception to indemnification contained in the immediately proceeding sentence shall not extend to the benefit of any third party, including but not limited to Affiliates and sublicensees of Licensee.

16.2    Indemnification By Licensor.    Licensor shall indemnify, defend, and hold harmless Licensee and its officers, directors, shareholders, employees, representatives, agents, and Affiliates from all claims, demands, liabilities, losses, damages, judgments or settlements, including all reasonable costs and expenses related thereto including attorney's fees and court costs, directly or indirectly resulting from: (a) any material breach by Licensee of the terms, conditions, or provisions of this Agreement; (b) the untruth of any representation or warranty made by Licensee in this Agreement; or (c) any claimed infringement of a patent of a third party in the Territory with respect to products of Licensee sold in the Territory, provided that such products are manufactured (i) in strict accordance with the disclosures of the Licensed Patents and the Licensed Know-How supplied to Licensee in writing by Licensor; and, (ii) as required in writing by Licensor. Such indemnification obligation of Licensor with respect to infringement of a patent shall not extend to the benefit any third party, including, but not limited to, Affiliates and sublicensees of Licensee.

16.3    Cooperation By Indemnified Party.    Notwithstanding Sections 16.1 and 16.2 of this Agreement, an indemnifying party is under no obligation to indemnify and hold an indemnified party harmless unless: (a) the indemnifying party shall have been promptly notified, by the indemnified party , of the suit or claim and furnished, by the indemnified party, with a copy of each communication, notice or other action relating to said claim; (b) the indemnifying party shall have the right to assume sole authority to conduct the trial or settlement of such claim or any negotiations related thereto at the indemnifying party's own expense, except that no compromise or settlement of any claim admitting liability of or imposing any obligations on the may be affected without the prior written consent of the indemnified party; and (c) the indemnified party shall provide reasonable information and assistance requested by the indemnifying party, including access to books and records, in connection with the defense of such claim.  If the indemnifying party refuses to defend or does not make known to the indemnified its willingness to defend against such claim within ten (10) days after it receives notice thereof, then the indemnified party shall be free to investigate, defend, compromise, settle or otherwise dispose of such claim in the indemnified party's best interest and incur other costs in connection therewith, all at the expense of indemnifying party.  Notwithstanding the foregoing, the indemnified party at all times reserves the right to retain counsel of its own to defend the indemnified party's interests.

#194084v2

23/06 03  MO  18:19 FAX                                                        ☒018

16.4    Insurance.   Licensee maintains and shall continue to maintain liability insurance coverage appropriate to the risk involved in developing, manufacturing, and marketing products or services related to the Licensed Patents, Licensed Know-How, or other information provided to Licensee under this Agreement. Such liability insurance coverage shall list Licensor and the inventors of the Licensed Patents as additional insureds. Within thirty (30) days after the Effective Date of this Agreement and thereafter annually between January 1st and 31st of each year, Licensee shall present evidence to Licensor that such liability insurance coverage is being maintained with Licensor and the inventors of the Licensed Patents as additional insureds. In addition, Licensee shall provide Licensor with at least thirty (30) days prior written notice of any change in or cancellation of such liability insurance coverage.

17.    **WARRANTIES/DISCLAIMER.**

17.1    Licensor Warranties.  Licensor warrants, represents and covenants that:

(a)    Licensor is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and the District of Columbia;

(b)    Licensor has the requisite power and authority to enter into this Agreement and to carry on business as presently conducted;

(c)    Licensor may execute, deliver and perform this Agreement without the necessity of obtaining any consent or giving any notice;

(d)    NAWA Heilmittel GmbH owns the entire right, title and interest in and to all Licensed Patents which are licensed to Licensee pursuant to the terms and conditions of this Agreement, and Licensor possesses the necessary and appropriate rights, under an exclusive license with NAWA Heilmittel GmbH, to sublicense the Licensed Patents to Licensee pursuant to this Agreement;

(e)    Licensor has not previously granted any licenses, agreements, or other permissions to any third party with respect to the Licensed Patents;

(f)    the Licensed Patents are free and clear of any and all encumbrances, liens, or title defects;

(g)    there is no pending or threatened litigation against Licensor in connection with the Licensed Patents;

(h)    with respect to any information of Licensee that constitutes Confidential Information or a Trade Secret (specifically including the previously delivered internal financial summary of the Licensee for the time period ended 12/31/03), Licensor will maintain the confidentiality of such information in accordance with the provisions of Article 11 of this Agreement;

#194086v2

(i)   the performance by Licensor hereunder does not and will not violate any contracts or commitments to which Licensor is bound, or knowingly violate any laws, rules, ordinances, or regulations applicable to Licensor; and,

(j)   this Agreement has been duly authorized, executed and delivered by Licensor and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as may be limited by bankruptcy, reorganization, insolvency and similar laws of general application relating to or affecting the enforcement of rights or creditors.

Notwithstanding the foregoing, nothing in this Agreement shall be construed as:

(a)   a warranty or representation by Licensor or NAWA Heilmittel GmbH as to the validity or scope of any of the Licensed Patents;

(b)   a warranty or representation that any process or anything made, used, sold, or otherwise disposed of under the License granted to Licensee in this Agreement will or will not infringe a patent or violate any other rights of third parties;

(c)   an obligation to bring or prosecute actions or suits against third parties for infringement of any of the Licensed Patents;

(d)   an obligation to furnish any know-how or other information not provided for in this Agreement;

(e)   an obligation to perform any actions not provided for in this Agreement; or,

(f)   a warranty or representation by Licensor that it will not grant licenses to others to use, make, have made, sell, offer for sale, or import products or services, as the case may be, which are not covered by the claims of the Licensed Patents and which may be similar and/or compete with products or services provided by Licensee.

17.2   <u>Licensor Warranty Disclaimer</u>.   EXCEPT FOR THE WARRANTIES EXPRESSLY PROVIDED BY LICENSOR IN THIS AGREEMENT, LICENSOR HEREBY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ASSUMES NO RESPONSIBILITY WHATSOEVER WITH RESPECT TO THE USE, MANUFACTURE, SALE, IMPORTATION, OR OTHER DISPOSITION BY LICENSEE OR THIRD PARTIES OF PRODUCTS OR SERVICES INCORPORATING, MADE, OR PERFORMED BY THE USE OF INVENTIONS OR INFORMATION LICENSED OR PROVIDED TO LICENSEE UNDER THIS AGREEMENT.

17.3   <u>Licensee Warranties</u>.   Licensee warrants, represents and covenants that:

(a)   Licensee is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware;

#194086v2

23/06 03  MO  18:20 FAX                                                                    Ø020

(b)  Licensee has the requisite power and authority to enter into this Agreement and to carry on business as presently conducted;

(c)  Licensee may execute, deliver and perform this Agreement without the necessity of obtaining any consent or giving any notice;

(d)  the transactions contemplated by this Agreement have been authorized by all necessary action of the Board of Directors of Licensee;

(e)  the performance by Licensee hereunder does not and will not violate any contracts or commitments to which Licensee is bound, or knowingly violate any laws, rules, ordinances, or regulations applicable to Licensee;

(f)  this Agreement has been duly authorized, executed and delivered by Licensee and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as may be limited by bankruptcy, reorganization, insolvency and similar laws of general application relating to or affecting the enforcement of rights or creditors;

(g)  with respect to any information of Licensor that constitutes Confidential Information or a Trade Secret, Licensee will maintain the confidentiality of such information in accordance with the provisions of Article 11 of this Agreement;

(h)  Licensee has the know-how to develop and commercialize pharmaceutical compounds for various indications in appropriate markets, and has the financial ability to do so; and

(i)  the internal financial summary of the Licensee for the time period ended 12/31/03, previously delivered to Licensor, is true, correct and complete in all material respects. There has been no material adverse change in the financial condition of the Licensee since such internal financial summary was prepared.

## 18.    LIMITATION/EXCLUSION OF DAMAGES.

18.1    Limitation of Liability.  IN NO EVENT SHALL LICENSOR BE LIABLE TO ANY LICENSEE OR ANY THIRD PARTY IN CONNECTION WITH THIS AGREEMENT, WHETHER SUCH LIABILITY ARISES FROM BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY, INTELLECTUAL PROPERTY INFINGEMENT OR MISAPPROPRIATION, OR OTHERWISE, FOR AN AMOUNT EXCEEDING THE SUM OF THE PAYMENTS MADE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRIOR TO THE DATE ON WHICH SUCH LIABILITY AROSE.

18.2    Exclusion of Damages.  NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES, WHETHER FORESEEABLE OR UNFORESEEABLE, BASED ON

#194086v2



'06 03  NO. 18:20 FAX                                                      ☎021

CLAIMS OF THE OTHER PARTY OR ITS CUSTOMERS OR THIRD PARTIES ARISING OUT OF BREACH OF EXPRESS OR IMPLIED WARRANTIES, BREACH OF CONTRACT, MISREPRESENTATION, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, EXCEPT ONLY IN THE CASE OF PERSONAL INJURY WHERE AND TO THE EXTENT THAT APPLICABLE LAW REQUIRES SUCH LIABILITY; PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN SHALL IMPAIR OR LIMIT LICENSEE'S INDEMNIFICATION OBLIGATIONS UNDER ARTICLE 16 OR LIMIT THE PARTIES WARRANTY OBLIGATIONS UNDER ARTICLE 17.

**19.   ARBITRATION.**

In the event that any disputes arise between the parties in connection with or related to this Agreement, the parties agree to work in good faith in an initial attempt to timely resolve such disputes through discussions between their respective executives. If any such dispute cannot be timely resolved by such discussions, such dispute shall be submitted to a representative of the McLean, Virginia office of Deloitte & Touche for resolution. Such representative shall have appropriate knowledge and experience in the healthcare industry. If Deloitte & Touche decides that it does not desire to assist in the resolution of such dispute, the parties shall submit such dispute to a mutually agreed upon third party for resolution. If no mutually acceptable resolution of such dispute is reached within fifteen (15) days of the submission of such dispute to Deloitte & Touche or a third party, as the case may be, the parties agree to submit such dispute to the dispute resolution process of JAG.

**20.   TERM AND TERMINATION.**

20.1   Term of the Agreement. This Agreement shall commence on the Effective Date hereof as indicated above and shall continue in full force and effect thereafter perpetually with respect to the Licensed Know-How and with respect to the Licensed Patents, until the expiration of the last of the Licensed Patents to expire (the "Term"), unless sooner terminated in accordance with the provisions hereof.

20.2   Termination by Either Party. Notwithstanding anything to the contrary in this Agreement, each party, by written notice to the other party, may terminate this Agreement (and the licenses granted herein) or suspend its further performance without terminating this Agreement if the other party has materially breached or failed to abide by or perform a provision of this Agreement and the other party has not cured the breach or failure (or, if the breach or failure is such that the cure would take a longer period, the other party has commenced to cure such breach or failure and has proceeded diligently therewith) within fifteen (15) days of receiving written notice from the non-breaching Party specifying such breach or failure.

20.3   Termination by Licensor.

A19404w2

23/06 03  MO  18:21 FAX                                                                    ☒022

PAGE 22

20.3.1 <u>Existing Sublicenses.</u>  In the event that Licensor terminates this Agreement for a reason other than Licensee's failure to meet the milestone set forth in Section 7.1(f) above, but continues any sublicenses previously granted by Licensee pursuant to Section 2.2 hereof, Licensor shall pay to Licensee royalty fees computed at the following rates, but subject to the proportional reductions set forth below:  (a) thirty-five percent (35%) of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights in the Territory; and, (b) if the parties amended this Agreement prior to such termination to include the member countries of the European Union within the Territory, (i) thirty-five percent (35%) of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights in the non-member countries of the European Union, and (ii) fifty percent (50%) of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights in the member countries of the European Union; provided, however, that Licensor shall have no obligation to pay royalty fees to Licensee in excess of the amount of Licensee's documented expenses as determined at such time, according to then current industry standards, by a representative of Deloitte & Touche or its successor (or by such other representative mutually agreed upon by the parties), which representative shall have appropriate knowledge and experience in the healthcare industry.  Such amount shall cover 100% of Licensee's hard costs and 50% of Licensee's soft costs incurred under the terms of this Agreement through the date on which the license is terminated.  All such royalties shall be paid in U.S. dollars to Licensee at the address provided in Section 21.16 below.

20.3.2 <u>No Existing Sublicenses.</u>  In the event that Licensor terminates this Agreement for any reason other than Licensee's failure to meet the milestone set forth in Section 7.1(f) above, but does not continue any sublicenses previously granted by Licensee pursuant to Section 2.2 hereof, Licensor shall pay to Licensee a royalty fee computed as the product of seven percent (7%) and the Net Sales Price of all Licensed Products sold or otherwise disposed of by Licensor; provided, however, that Licensor shall have no obligation to pay royalty fees to Licensee under this Section 20.3.2 in excess of the amount of Licensee's documented expenses as determined at such time, according to then current industry standards, by a representative of Deloitte & Touche or its successor (or by such other representative mutually agreed upon by the parties), which representative shall have appropriate knowledge and experience in the healthcare industry.  Such amount shall cover 100% of Licensee's hard costs and 50% of Licensee's soft costs incurred under the terms of this Agreement through the date on which the license is terminated.  All such royalties shall be paid in U.S. dollars to Licensee at the address provided in Section 21.16 below.

20.3.3 <u>Additional Royalty; Existing Sublicenses.</u>  In the event Licensee fails to meet the milestone described in Section 7.1(f) above, the license granted under this Agreement is terminated, and the Licensor continues any sublicenses previously granted by Licensee pursuant to Section 2.2 hereof, Licensor shall pay to Licensee, in lieu of the amounts otherwise payable under Section 20.3.1. above:

(a)     50% of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights throughout the world during the first year after such termination;

#19408Av2

(b)    40% of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights throughout the world during the second year after such termination;

(c)    30% of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights throughout the world during the third year after such termination;

(d)    20% of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights throughout the world during the fourth year after such termination;

(e)    10% of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights throughout the world during the fifth year after such termination; and

(f)    0% of all consideration payable to Licensor by such sublicensees in connection with the sublicensing of rights throughout the world thereafter.

20.3.4.  Additional Royalty; No Existing Sublicenses.  In the event Licensee fails to meet the milestone described in Section 7.1(f) above, the license granted under this Agreement is terminated, and the Licensor does not continue any sublicenses previously granted by Licensee pursuant to Section 2.2 hereof, Licensor shall pay to Licensee, in lieu of the amounts otherwise payable under Section 20.3.2. above:

(a)    the product of 10% and the Net Sales Price of all licensed products sold or otherwise disposed of by Licensor throughout the world during the first year after such termination;

(b)    the product of 8-1/2% and the Net Sales Price of all licensed products sold or otherwise disposed of by Licensor throughout the world during the second year after such termination;

(c)    the product of 7% and the Net Sales Price of all licensed products sold or otherwise disposed of by Licensor throughout the world during the third year after such termination;

(d)    the product of 6% and the Net Sales Price of all licensed products sold or otherwise disposed of by Licensor throughout the world during the fourth year after such termination;

(e)    the product of 5% and the Net Sales Price of all licensed products sold or otherwise disposed of by Licensor throughout the world during the fifth year after such termination; and

#194086v2

23/06 03 MO 18:22 FAX                                                          ☒024

(f)    the product of 0% and the Net Sales Price of all licensed products sold or otherwise disposed of by Licensor throughout the world thereafter.

20.4    Effect of Expiration or Termination.  Expiration or earlier termination of this Agreement shall not relieve the parties of their continuing obligations under those provisions of this Agreement that, by their terms, or in accordance with Section 21.9, survive the expiration or termination of this Agreement.  In addition, the parties shall perform as follows:

(a)    upon any termination becoming effective, all rights and licenses granted hereunder shall terminate and be of no further force and effect (unless expressly stated to the contrary herein); however, such termination shall not relieve either party of any obligations accruing up to and owing to the other party at the time of such termination;

(b)    Licensee shall, and shall cause its Affiliates and sublicensees to, immediately cease using all Licensed Patents, Licensed Know-How, and Licensor Confidential Information and immediately cease the use, manufacture, sale, offer for sale, and importation of Licensed Products;

(c)    Licensee shall immediately make payment to Licensor of all amounts presently due and owing to Licensor;

(d)    Licensee shall immediately return to Licensor all copies of Licensor materials and Licensor Confidential Information provided to Licensee by, or on behalf of, Licensor and non-recoverably destroy all copies thereof and any works which include, in whole or in part, any Licensor materials or Licensor Confidential Information;

(e)    Licensee shall comply with any other post-termination provisions of this Agreement (including, but not limited to, the covenants of Articles 11 and 13);

(f)    Licensor shall immediately cease using all Licensee materials and Licensee Confidential Information;

(g)    Licensor shall immediately return to Licensee all copies of Licensee materials and Licensee Confidential Information provided to Licensor by, or on behalf of, Licensee and non-recoverably destroy all copies thereof and any works which include, in whole or in part, any Licensee materials or Licensee Confidential Information; and,

(h)    Licensor shall comply with any other post-termination provisions of this Agreement (including, but not limited to, the covenants of Articles 11 and 13).

21.    **MISCELLANEOUS.**

21.1    Brokers.  Licensee has not become obligated to pay, and has not taken any action that might result in an person or entity claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with this Agreement.

#194086v2

21.2    Service on Board of Directors.  Licensor and Licensee acknowledge and agree that Mr. Thomas Riesinger, or an alternative executive selected by NAWA Heilmittel GmbH, shall serve as a Director on the Board of Directors of BioDerm Sciences, Inc. for mutually agreeable consideration (including, but not limited to, some cash, reimbursement of expenses, and some limit on the maximum amount of time associated with the provision of such service) for a period of one to two years, with the initiation of such service to begin within thirty (30) days after the Effective Date of this Agreement.

21.3    Entire Agreement.  This Agreement, including all exhibits, attachments, and schedules attached hereto, if any, contains the entire understanding between the parties and supersedes all prior and collateral proposals, discussions, communications, statements, reports, and understandings between the parties relating to the subject matter hereof unless set forth or referenced in this Agreement.  If there is a conflict between the terms and conditions of this Agreement and those of any exhibit, attachment, or schedule, the terms and conditions of this Agreement control over those of the exhibit, attachment, or schedule.  However, to the extent possible, the parties shall construe the terms and conditions of this Agreement and the exhibits, attachments, or schedules, if any, as complementary to each other.

21.4    Amendment.  Except as expressly set forth herein, no amendment, change, modification, alteration, or addition to any provision hereof shall be binding unless in writing and executed by authorized representatives of both parties.

21.5    Waiver.  Except as expressly set forth herein, none of the terms of this Agreement shall be deemed to be waived, in whole or in part, by either party unless such waiver is in writing and executed by authorized representatives of both parties.  No waiver of any provision of this Agreement shall render unenforceable any other provision of this Agreement.

21.6    Assignment.  This Agreement and the licenses granted hereunder may be assigned by either party to (a) an Affiliate or subsidiary without the consent of the other party, and (b) to a non-Affiliate or non-subsidiary with the prior written consent of the other party, which consent shall not be unreasonably withheld.  In the event that a party assigns this Agreement and the licenses granted hereunder to an Affiliate or subsidiary thereof, the assigning party shall remain liable for its obligations hereunder.

21.7    Burdens and Benefits.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

21.8    Severability.  In the event that any provision of this Agreement is held void, voidable, invalid, or inoperative by any court of competent jurisdiction or any appropriate legislature, no other provision of this Agreement shall be affected as a result thereof, and the remaining provisions of this Agreement shall be valid and remain in full force and effect as if such void, voidable, invalid, or inoperative provision had been omitted.

23/08 03  MO  18:23 FAX                                                                    ☒026

21.9   Survivability.  Terms and conditions that require performance after the expiration or termination of this Agreement, including, without limitation, all provisions relating to payments, records, Confidential Information, Intellectual Property, indemnification, limitation of liability, exclusion of damages, non-competition, warranties, and termination, will survive any expiration or termination of this Agreement.

21.10   Headings.  The headings of the Sections of this Agreement are for convenience only and shall not be a part of or affect the meaning or interpretation of this Agreement.

21.11   Plans, Exhibits, Attachments, and Schedules.  The content, provisions, terms and conditions of any and all plans, exhibits, attachments, and schedules (including, but not limited to, any and all plans, exhibits, attachments, and schedules that are not completed as of the execution of this Agreement, if any, and any and all amended plans, exhibits, attachments, and schedules) are by this reference incorporated into this Agreement.

21.12   Compliance with Laws.  Each party and its directors, officers, shareholders, members, principals, participants, employees, and agents shall comply with applicable laws, ordinances, regulations, and codes, including the identification and procurement of required permits, certificates, approvals, and inspections, if any, in connection with or related to the performance of this Agreement.

21.13   Choice of Laws.  THE VALIDITY, CONSTRUCTION, AND ENFORCEMENT OF THIS AGREEMENT, AND THE DETERMINATION OF THE RIGHTS AND DUTIES OF THE PARTIES, ARE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE OF THE UNITED STATES OF AMERICA (EXCLUDING ANY CHOICE OF LAW PRINCIPLE THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

21.14   Remedies.  The Parties understand and agree that the mutual promises and covenants of this Agreement are special, unique, and of extraordinary character, and in the event of any default, breach, or threatened breach of this Agreement by either party or any of its employees, agents or other personnel of any covenant or provision in this Agreement applicable to such party, the other party shall be entitled, at its sole discretion, to institute and prosecute proceedings in an appropriate court, either at law or in equity, and shall be entitled to any and all such remedies (including any damages, injunctive relief, specific performance, or combination thereof) as may be available at law or in equity.

21.15   Attorneys and Attorneys' Fees.  Both parties acknowledge that they have been represented by counsel during the negotiation of this Agreement and agree that the Agreement shall not be interpreted or enforced any more or less stringently against either party in the event of a dispute between the parties as may, otherwise, be the case if one party had not been represented by counsel.  In the event that either party employs attorneys to enforce any right arising out of or relating to this Agreement, each party shall bear its own attorneys' fees and costs.

21.16   Notices.

4194686-2

23/06 03  NO.18:23 FAX                                                      @027

**PAGE 27**

(a)  All notices, requests, demands, and other communications (collectively, "Notices") required or permitted by this Agreement shall be in writing and become effective when delivered (except as may be expressly be provided otherwise in this Agreement) to the following addressees at the following addresses:

If to Licensor:

"NAWA USA, Inc."                              with a copy (which shall not constitute notice) to:

1825 Eye Street, N.W., Suite 400             Howard J. Ross, Esquire

Washington, D.C. 20006                       1660 International Drive, Suite 600

Attn:  Thomas Riesinger, President           McLean, Virginia  22102

                                             Facsimile: (703) 448-6505

e-Mail:  thomas.riesinger@nawa.com           e-Mail:  howard.ross@troutmansanders.com


If to Licensee:


"Health Pathways, Inc."

101 Orchard Ridge Drive, Suite 1N

Gaithersburg, Maryland  20878

Attn:  J. Randall Hoggle, President and CEO

Facsimile:  (301) 216-3919

e-Mail:  rhoggle@healthpathways.com


(b)  A facsimile notice (confirmed by facsimile confirmation sheet) constitutes an acceptable writing in accordance with this Section 21.16.


(c)  A party may change its addressee or address for receiving Notices by providing a Notice of such change in accordance with this Section 21.16


21.18  Relationship of the Parties.  The parties acknowledge and agree that with respect to each other, each party is an independent contractor.  Neither party is authorized to make any representations or create any obligation or liability, expressed or implied, on behalf of the other party, except as may be expressly provided for in this Agreement.  Each party acknowledges that the other party is not bound by any representations, warranties, covenants, contracts, agreements, or understandings made by the other party, or to which the other party may be subject, that are inconsistent with any provision of this Agreement.

#1040504v2

@029

21.19  <u>Publicity</u>.  Upon the acceptance by Licensor of the strategic product development plan described in Section 6.1 above, the parties shall issue a press release which is mutually agreed upon by the parties.

21.20  <u>Warranty of Authority</u>.  The parties warrant that the terms of this Agreement are valid and binding, and that the respective undersigned persons are authorized to execute this Agreement on behalf of the respective parties.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Agreement.

"Licensor"                              "Licensee"

NAWA USA, Inc.                          Health Pathways, Inc.

By: _____                   By: _____

Name: _RIESINGER_____                Name: _J. Ransford Hoople_

Title: _President / CEO__                 Title: _President / CEO__

Date: _6/23/03_____                  Date: _6/23/03_____

#1946986v2

## SCHEDULE 1
## TO
## LICENSE AND CO-DEVELOPMENT AGREEMENT
## BETWEEN NAWA USA, INC. AND HEALTH PATHWAYS, INC.

### Patents and Patent Applications

1.     United States Patent No. 5,079,010, entitled "Pharmaceutical Preparation for the Treatment of Wounds, Damaged Tissue and Inflammation in Animals," filed on September 22, 1989, and issued on January 7, 1992.

2.     Canadian Patent No. 1,330,419, entitled "Pharmaceutical Preparation Containing Essential Metallic Trace Element," filed September 22, 1989, issued on June 28, 1994.

3.     European Patent No. EP 0 363 696 B1, entitled "Pharmazeutische Zubereitung sowie Verfahren zu ihrer Herstellung," filed on September 20, 1989, and issued on May 26, 1993.

4.     International Patent Application No. PCT/DE02/00031, entitled "Treatment Solution Used for Caring for Wounds in Addition to Dressing Material for Use with Said Treatment Solution," filed on January 9, 2002, International Publication No. WO 02/056896 A2, published on July 25, 2002.

5.     International Patent Application No. PCT/DE02/00032, entitled "Dressing Material in Addition to Treatment Solution for Use with Said Dressing Material," filed on January 9, 2002, International Publication No. WO 02/056927 A2, published on July 25, 2002.

6.     International Patent Application No. PCT/DE02/02910, entitled "Pharmaceutical Preparation for Treating Wounds," filed on August 8, 2002, International Publication No. WO 03/018035 A1, published on March 6, 2003.

7.     International Patent Application No. PCT/DE02/00763, entitled "Medical Preparation That Promotes Acceptance of a Graft," filed on March 1, 2002, International Publication No. WO 02/070027 A1, published on September 12, 2002.

NAWA_ Schedule 1 for NAWA agreement with Health Pathways.DOC